GAPHPARC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                              16 CR 522 (RJS)


PASQUALE PARRELLO,

                                       Bail Hearing
           Defendant.

------------------------------x

                                       New York, N.Y.
                                     October 25, 2016
                                     10:44 a.m.


Before:

                HON. RICHARD J. SULLIVAN,

                                   District Judge

                         APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
AMANDA KRAMER
JONATHAN REBOLD
     Assistant United States Attorneys

MARK S. DeMARCO
KEVIN B. FAGA
     Attorneys for Defendant

ALSO PRESENT:   ANDREW KESSLER-CLEARY, PSO

GAPHPARC

1              (Case called)

2              THE COURT:  Good morning.  Let me take appearances for

3    the government.

4              MS. KRAMER:  Good morning, your Honor.  Amanda Kramer

5    and Jonathan Rebold for the government.

6              THE COURT:  Yes.  Good morning.

7              MS. KRAMER:  I'm joined at counsel table by United

8    States Pretrial Services Officer Andrew Kessler-Cleary.

9              THE COURT:  Yes.  Good morning to each of you.  Thank

10   you.

11             And for the defendant.

12             MR. DeMARCO:  Your Honor, Mark DeMarco and Kevin Faga

13   for Mr. Parrello.  Good morning, your Honor.

14             THE COURT:  Good morning, Mr. Marco, Mr. Faga,

15   Mr. Parrello.

16             I'll just remind everybody why we're here.

17   Mr. Parrello was arrested, I guess, back in August and was

18   detained on consent at that time without prejudice to renewing

19   or making a motion for bail.  So I now am in receipt of a

20   letter request from Mr. DeMarco dated October 11, as well as a

21   response from the government dated October 13; and then also an

22   ex parte supplemental letter from the government dated

23   October 13, which I don't intend to rely on; and then I finally

24   have a follow-up letter dated October 21 from Mr. DeMarco just

25   asking if certain information in the submission that he sent to

3

GAPHPARC

1    me originally could be filed under seal or redacted.  So that's

2    what I have.

3            I've read everything everybody sent me.  I think the

4    standards are pretty clear.  I don't think there's any dispute

5    as to what the standard the Court should be applying here is,

6    so I won't spend a lot of time on that.  The way I thought I

7    would do this is hear from Mr. DeMarco first, since it's his

8    motion, and then hear from the government, and then I'll allow

9    Mr. DeMarco to respond to whatever points the government makes.

10   I may have some questions as we go.

11           How's that strike you?

12           MS. KRAMER:  That's fine with the government, your

13   Honor.  Thank you.

14           THE COURT:  Mr. DeMarco?

15           MR. DeMARCO:  Sounds good, Judge.

16           THE COURT:  Okay.  Great.

17           MR. DeMARCO:  Judge, just that letter seeking the

18   redaction is a response to the Court's order to file my motion

19   on ECF.

20           THE COURT:  Yes.

21           MR. DeMARCO:  I haven't complied with that order

22   because I was --

23           THE COURT:  I think that's fine.  Some of the personal

24   information I think you're talking about are things that would

25   be covered anyway.  There are things that are redacted by

1     virtue of the local rule and/or the civil rule, the Federal

2     Rule of Criminal Procedure.  With respect to other information,

3     it wasn't clear to me exactly what you were referring to, so --

4               MR. DeMARCO:  There's a list on, I believe -- I can

5     tell you exactly -- on pages 4 and 5 of potential guarantors or

6     cosigners on Mr. Parrello's potential bond.  And my letter just

7     seeks to redact the names, places of employment, and annual

8     salaries of those --

9               THE COURT:  How about the addresses of the properties?

10              MR. DeMARCO:  Those addresses we're okay being public.

11    They're a matter of public record.

12              THE COURT:  The real property you don't have a problem

13    with?

14              MR. DeMARCO:  No, your Honor.

15              THE COURT:  Other than -- well, do you care about the

16    ownership of those properties?

17              MR. DeMARCO:  No, they're family.  They're

18    Mr. Parrello's family.

19              THE COURT:  The additional guarantors?

20              MR. DeMARCO:  That's right.

21              THE COURT:  Which is a lengthy list.  Does the

22    government have a view with respect to that?

23              MS. KRAMER:  We have no objection to that information

24    being redacted, your Honor.

25              THE COURT:  There's a presumption of open records.

5

GAPHPARC

1   That presumption can be rebutted when there's good cause.  The

2   personal privacy of nonparties is something that's typically

3   considered and is often a basis for sealing or redacting

4   certain information from the record.  So I think that that

5   probably makes sense here.  I mean, it's a long list.  I think

6   the number of proposed cosigners is relevant, so it's one, two,

7   three, four -- 37 by my count.  Is that what you have?

8          MR. DeMARCO:  Yes.

9          THE COURT:  I will say it includes a medical doctor, a

10  retired judge, somebody who works for the Archdiocese of New

11  York, various business people, union people, restaurant owners.

12  It's quite an assortment of individuals and from quite an

13  assortment of employment.  So I think that's enough said.

14         All right.  Go ahead.

15         MR. DeMARCO:  So we're okay with the redaction?

16         THE COURT:  You can redact those names.

17         MR. DeMARCO:  I will electronically file this document

18  redacted by this afternoon by the end of business.

19         THE COURT:  Okay.

20         MR. DeMARCO:  Judge, may I?

21         THE COURT:  You may proceed, yes.

22         MR. DeMARCO:  Thank you.  Judge, in this case against

23  Mr. Parrello, there is a presumption of detention, but it's a

24  rebuttable presumption, your Honor.  And it's our position that

25  there is a combination of factors here that reasonably assure

1  safety to the community and Mr. Parrello's return to court

2  should he be released.

3       THE COURT:  I think the government's not really

4  arguing risk of flight, are you?

5       MS. KRAMER:  Your Honor, given the proposed package

6  with the number of cosigners, properties belonging to family

7  members, strict pretrial supervision, home detention, I think

8  it's fair to say that some combination of conditions could be

9  fashioned to address the risk of flight to mitigate it

10  sufficiently under the Bail Reform Act.  So that's not a basis

11  for our argument.

12       THE COURT:  You're relying on dangerousness and

13  principally you're relying on the fact that Mr. Parrello

14  engaged in this alleged conduct while he was on supervision --

15       MS. KRAMER:  Yes, your Honor.

16       THE COURT:  -- for a prior conviction, and that he

17  basically ordered and directed others to engage in acts of

18  violence from the comfort of his own home and business, which

19  gives little consolation, then, that he would be deterred or

20  dissuaded from engaging in comparable acts of violence going

21  forward.

22       MS. KRAMER:  Exactly, your Honor.

23       THE COURT:  So I'll let you respond, Mr. DeMarco.

24  Let's just focus on dangerousness.

25       MR. DeMARCO:  Your Honor, I still want to go into a

```
 1    little bit of Mr. Parrello's background in order to do this.

 2                THE COURT:  That's fine.

 3                MR. DeMARCO:  As the Court can see, Mr. Parrello is

 4    not a young man.  He's 72 years old.  He was born in 1944 in

 5    the Bronx, in St. Francis Hospital in the Bronx.  He attended

 6    Theodore Roosevelt High School in the Bronx.  He's been married

 7    to the same woman for 50 years, your Honor.  In 1966 he married

 8    Mrs. Parrello.  He has one daughter who is a professor at the

 9    Dominican College.  She obtained her doctorate in sociology, I

10    believe criminal justice.  He has grandchildren who he's very

11    close with and actually cared for before he was arrested in

12    this case.  His whole family, his whole life, friends,

13    neighbors, either live in the Bronx or Westchester County or

14    somewhere within the metropolitan area.

15                Now, Mr. Parrello has one prior criminal conviction,

16    although at the age of --

17                THE COURT:  It's two, I guess.

18                MR. DeMARCO:  I'm not sure if that conviction at the

19    age of 17, your Honor, is a criminal conviction because it's

20    for disorderly conduct.

21                THE COURT:  I'm not too worried about that one,

22    whatever it is.  So, yes, we have a felony that got him 88

23    months, I think, here.

24                MR. DeMARCO:  That's right.  In 2003 he was -- he was

25    convicted upon his plea of guilty to a racketeering indictment.
```

GAPHPARC

1    He was sentenced by Judge Carter to 88 months' imprisonment.

2    So the only issue now is whether Mr. Parrello is a danger to

3    the community.

4              THE COURT:  Right.

5              MR. DeMARCO:  It's important to note, your Honor, that

6    in this indictment, he's not implicated in the arson.  It's not

7    alleged that he trafficked firearms or possessed firearms.  The

8    indictment alleges conduct that occurred in 2011 to 2014.  That

9    would be the extortion, the loansharking count, and the

10   assaults that took place in 2011 and 2013.  Now, he was

11   arrested in 2016, August 2016, and there's no allegations of

12   violence, extortion or conduct of assaults or anything of a

13   violent nature after 2014, but let's go on.

14             In this case, your Honor, where we're concerned with

15   safety to the community, it's important to note that the

16   outpouring from Mr. Parrello's community has been overwhelming.

17   As set forth in my bail application, the written one, 37 people

18   have come forward offering to act as cosigners on any bond

19   issued by this Court.  Now, we have doctors, lawyers, retired

20   judges.  We have business owners.  We have plumbers.  We have

21   carpenters.  We have people from all walks of life from the

22   community that are -- the outpouring has been incredible, your

23   Honor.  Basically, what these people are saying in volunteering

24   to cosign any bond for Mr. Parrello is that he is not a danger

25   to the community.  This is a man that we trust.  This is a man

GAPHPARC

1    who we respect.  This is a man who we're willing to come into

2    court and risk our financial futures on because we believe that

3    he is not a danger to the community.

4            THE COURT:  Well, I mean, I gather they haven't heard

5    the wiretaps and they haven't seen the evidence, but at least

6    the government's letter quotes directly from some of the calls

7    that reflect Mr. Parrello's involvement in directing acts of

8    violence and racketeering.  So I don't know what the cosigners

9    know or don't know, but I'm not sure that it's a vote and that

10   the sheer number of them means that he's not a danger.  It's a

11   different inquiry.  Is there a response?

12           MR. DeMARCO:  They know the man seated in this

13   courtroom.  They know the character of the man seated in this

14   courtroom.  They know him from personal dealings with him, and

15   often that's a way to size up a person's character, an

16   individual's character, whether he or she is a danger to a

17   community.

18           Now, Mr. Parrello operated a restaurant on Arthur

19   Avenue in the Bronx.  It's funny, if you walk down Arthur

20   Avenue, there's a slew of businesses.  And it seems as if --

21   for example, Gilbert Teitel.  He owns Teitel Brothers.  That's

22   on Arthur Avenue.  He's come forward and offered to sign a

23   bond.  Sal Biancardi, who is the owner of Biancardi Meats

24   that's on Arthur Avenue right down the block from

25   Mr. Parrello's restaurant, he's come forward and offered to

GAPHPARC

```
 1    sign a bond.  You have Joseph Cozenza, who is the owner of

 2    Cozenza's Fish Market right on Arthur Avenue, right down the

 3    block from Mr. Parrello's restaurant.  He's come forward and

 4    offered to sign a bond.  Mr. Parrello's community, both

 5    business and personal, have come forward, pretty much have said

 6    to this Court and to me and to Mr. Parrello:  We do not believe

 7    he is a danger to the community.

 8            They haven't heard the recordings.  Quite frankly,

 9    your Honor, neither have I, because they haven't been turned

10    over yet.  Well, they haven't been -- they've been provided by

11    the government to the discovery coordinator, and the discovery

12    coordinator's in the process of putting that together for the

13    attorneys in this case.

14            But these are just allegations, your Honor.  These are

15    recordings that we haven't heard.  The allegations in the

16    indictment are just that, they're allegations.  I realize the

17    standard here is preponderance of the evidence, but in

18    preparing for this, I took the time to read the case *U.S. v.*

19    *Salerno*, the Supreme Court case.  And in his dissent, Justice

20    Marshall quoted, and he said:  "Allegations are legally

21    presumed to be untrue."  And that's where we are here.  We have

22    allegations against Mr. Parrello that are presumed to be

23    legally untrue at this time.

24            Now, in *Salerno*, I noted that -- I noticed that the

25    Supreme Court condoned pretrial detention of Anthony Salerno on
```

1    the grounds they did not violate his Fifth Amendment right to

2    due process or his Eighth Amendment rights.  Now, in that case,

3    your Honor, Mr. Salerno was 74 years old, two years older than

4    Mr. Parrello is today, but in that case, what I learned in

5    reviewing the history of *U.S. v. Salerno* is that this was the

6    second indictment unsealed against Mr. Salerno.  At the time

7    this case became at issue, Mr. Salerno was out fighting the

8    commission case, which he was indicted in 1995 in the

9    commission case.  And he was out on $2 million bond in a case

10   where murders were alleged, violent acts were alleged by

11   Mr. Salerno.  Mr. Salerno was out on that case until this

12   second indictment was unsealed in March of 1986 that resulted

13   in *U.S. v. Salerno*.  So there is precedent for allowing people

14   charged in these types of cases to --

15            THE COURT:  Of course.  It's not a foregone

16   conclusion.  It's not a function of being charged.  And most of

17   the folks in this case are out on bail.

18            MR. DeMARCO:  That's right.

19            THE COURT:  I mean, the vast majority.  There's 46

20   defendants.  I think there's only seven in custody.  So you're

21   not telling me anything I don't know on that score.  I

22   understand.

23            MR. DeMARCO:  Your Honor, it's our position there are

24   mechanisms in place that, in addition to any cosigners and any

25   monetary amount of any bond that's fixed by this Court, there

GAPHPARC

are measures in place to assure (a) that Mr. Parrello doesn't

flee and, more importantly, that he is not a danger to the

community: strict pretrial supervision, electronic monitoring,

home detention.

          In fact, I was doing some additional research, and I

noticed in a case before Judge Swain, where a defendant was

charged in a bank robbery or bank burglary indictment, she

imposed a condition whereby the defendant in that case, his

name was Anthony Mascuzzio -- the indictment is 16 CR 576 --

would not be permitted to possess a cell phone and that his

landline would be monitored to prevent any communication to

anyone that the Court was concerned with.  Let's leave it at

that.  There are mechanisms in place, in addition to the

monetary amount fixed on a bond, that can ensure that

Mr. Parrello, at 72 years old, is not a danger to the

community.  And this is one of the mechanisms to safeguard

against that, your Honor.

          He's 72 years old, Judge.  He's not a risk of flight.

There's a home where he could live, where he would be amenable

to home detention, Judge, electronic monitoring, monitoring of

his telephone.  He would forgo the right to possess a cell

phone.  All measures that would alleviate this Court's concern

that he's a danger to the community.  No association with any

felons, no association with codefendants absent the presence

of --

GAPHPARC

| | |
|---|---|
| 1 | THE COURT:  Those were conditions of supervised |
| 2 | release in many ways; right?  He wasn't allowed to be |
| 3 | associating with felons when he was on supervised release, and |
| 4 | yet he was according to what was in the indictment. |
| 5 | MR. DeMARCO:  Judge, Mr. Parrello was discharged from |
| 6 | supervised release in May of 2011.  It's my understanding that |
| 7 | the crimes alleged in this indictment -- |
| 8 | THE COURT:  Wait.  He was discharged from supervised |
| 9 | release in 2011? |
| 10 | MR. DeMARCO:  May of 2011. |
| 11 | THE COURT:  Sentenced to 88 months. |
| 12 | MR. DeMARCO:  In 2003.  But he was arrested in 2001, |
| 13 | and he was detained in that case. |
| 14 | THE COURT:  He was detained in that case? |
| 15 | MR. DeMARCO:  Yes, your Honor. |
| 16 | THE COURT:  The charges here are more serious than the |
| 17 | charges there, wouldn't you say? |
| 18 | MR. DeMARCO:  Yes. |
| 19 | THE COURT:  But he was detained in that case.  I |
| 20 | interrupted you.  I'm sorry. |
| 21 | MR. DeMARCO:  Your Honor, that was 2001.  Now we're |
| 22 | talking about -- he was much younger back then.  He was 15 |
| 23 | years younger.  He was 56, 57.  There is technology in place |
| 24 | today, as I mentioned previously, that could alleviate any |
| 25 | concern that Mr. Parrello was a danger to the community that I |

GAPHPARC

1   believe may not have been in place back in 2001 when the

2   initial -- when his first case was unsealed.

3          THE COURT:  What did not?  Electronic monitoring?

4          MR. DeMARCO:  I'm sorry?

5          THE COURT:  Electronic monitoring?

6          MR. DeMARCO:  No, that existed.

7          THE COURT:  Yes, that definitely existed.

8          MR. DeMARCO:  The ability to monitor his phones.

9          THE COURT:  That existed.

10          MR. DeMARCO:  Not to the extent -- not as easy as it

11   would be to do so today, your Honor.

12          THE COURT:  Maybe.  I'm not sure.  I mean, I can't

13   say.  It seems to me that technology is sort of a double-edged

14   sword.  So for every advancement, there's probably an equal and

15   opposite counterstrategy that can be employed.  But I have no

16   reason to think that -- anyway, I understand the technology

17   about as well as you do, I suppose.  I don't claim to be an

18   expert in the field.  It is not unusual that defendants

19   awaiting trial do get bail, and they are able to comply with

20   the conditions of bail by being on electronic monitoring with

21   GPS location, etc.  I mean, it happens.  But those are

22   typically cases that involve risk of flight as the primary

23   concern, not dangerousness.

24          But I interrupted you again.  I'm sorry.

25          MR. DeMARCO:  No, I was answering your Honor's

1   question about whether he associated with felons while on

2   supervised release, and my response to that was it's my belief

3   that the crimes alleged in this indictment took place after he

4   was discharged from supervised release.  He was released -- he

5   was discharged from supervised release in May of 2011, and it's

6   my understanding that the crimes alleged in this case took

7   place after that, if that answers your Honor's previous

8   question.

9           Your Honor, Mr. Parrello is not --

10          THE COURT:  The racketeering conspiracy is from at

11  least in or about 2010 up to and including at least in or about

12  2016.

13          MR. DeMARCO:  But I believe --

14          THE COURT:  So that predates his --

15          MR. DeMARCO:  Right, the conspiracy.

16          THE COURT:  Racketeering conspiracy.

17          MR. DeMARCO:  Based on the specific allegations with

18  respect to Mr. Parrello that I reviewed, your Honor --

19          THE COURT:  Well, he's in the racketeering conspiracy.

20          MR. DeMARCO:  He joined the conspiracy at a later

21  time.  It's impossible for him not to have been in it in 2010

22  through -- isn't it, Judge?

23          THE COURT:  Why would it be impossible to be in it?

24          MR. DeMARCO:  Not impossible.  It would be possible.

25          THE COURT:  Well, I mean, the government can shed

GAPHPARC

1    light on this, I suppose, in a minute.  But it's not obvious to

2    me that his involvement was only after he was off of supervised

3    release.  The substantive counts all postdate that, because

4    substantive counts typically have a five-year statute of

5    limitations.  But the racketeering conspiracy, the beginning

6    date and the end date are what matters, and the end date is

7    certainly within the statute of limitations period and the

8    beginning date is what it is, if it straddles.

9            MR. DeMARCO:  Your Honor, another argument that cuts

10   against Mr. Parrello being a danger to the community is, again,

11   I keep repeating, he's 72 years old.  But as a 72-year-old man,

12   he does have assorted health ailments.  He has high blood

13   pressure.  He has a history of back problems.  He has problems

14   with his hearing.  He has problems with his teeth.  I believe

15   that these are also factors that this Court should consider in

16   determining whether or not Mr. Parrello is a danger to the

17   community.

18           Your Honor, with that said, I'm asking that this Court

19   set a extremely high secured bail bond in the amount nearing

20   $2 million, secured by the properties listed as well as the

21   signature of however many cosigners that are vetted by the

22   government that this Court requires with a condition set forth

23   for strict pretrial supervision of electronic monitoring and

24   whatever mechanisms that this Court can think of to ensure

25   that, to alleviate your concern, that Mr. Parrello is not a

GAPHPARC

1    danger to the community, and I submit that he's not.  And there

2    are mechanisms in place that can ensure that he is not.

3        THE COURT:  All right.  Let me hear from Ms. Kramer,

4    and then I'll give you a chance to respond to her.

5        Ms. Kramer, I guess the first question I have for you

6    pertains to the period of Mr. Parrello's involvement in the

7    racketeering conspiracy.  The indictment says that the

8    conspiracy went from at least 2010 right up until 2016, the

9    present or the date of the arrest.  What's the evidence with

10   respect to Mr. Parrello's involvement?

11       MS. KRAMER:  So, your Honor, there was a wiretap or

12   more than one wiretap in Westchester County that captured the

13   defendant engaged in gambling conduct while on supervised

14   release in this case.  So the defendant will be receiving that

15   evidence.  And it unequivocally demonstrates that he was

16   participating in this conspiracy and actively committing crimes

17   while on supervised release.

18       Shortly after his supervised release, it appears he

19   wasted no time in engaging in violent crimes.  The order to

20   break the knees of the panhandler who was disturbing customers

21   of Rigoletto restaurant was given by the defendant in June of

22   2011.  So approximately one month, maybe six weeks after his

23   supervised release terminated, he was ordering his underlings

24   to break the knees of a panhandler.  The command to choke and

25   threaten to kill someone who owed him money was given in

GAPHPARC

December of 2011, approximately seven months after his

release -- after his termination of supervised release.

While the government must show that the defendant is a

danger by clear and convincing evidence, there is an abundance

of clear and convincing evidence in this case if all the Court

looks at are the defendant's own words.  He commanded his

underlings, in addition to the violent crimes I just recited,

to use a pipe to strike an enemy of his in the knees, to slash

the tire of someone who owed him money, to force that man to

fix the tire at which point he could be surrounded, and he also

ordered one of his underlings to buy 9 millimeter handguns.  He

asked if they were clean and ordered him to get some nines.

Just taking his own recorded statements, there's

overwhelming evidence that he's a danger to the community,

coupled with the fact that even on federal supervised release,

he didn't refrain from engaging in this conspiracy, which would

include typically more severe penalties and stricter conditions

than any pretrial supervision --

THE COURT:  What would include stricter?

MS. KRAMER:  The federal supervised release that he

was on when he was committing crimes following his custody,

following his incarceration for his prior conviction.

THE COURT:  You're saying that would be stricter than

bail conditions as part of pretrial supervision?

MS. KRAMER:  Well, I think, generally speaking, it's

GAPHPARC

1    fair to say that the violation of a term of supervised release

2    carries more significant and certain penalties than the

3    violation of terms of pretrial supervision.  That did not

4    dissuade the defendant from committing very serious crimes

5    while on supervised release.

6            THE COURT:  But the crimes while he's on supervised

7    release are his joining in the racketeering conspiracy.

8            MS. KRAMER:  Yes.

9            THE COURT:  What's the evidence of that while he was

10   on supervised release?

11           MS. KRAMER:  Wiretaps capturing the defendant engaged

12   in gambling conduct and directing others to engage in gambling

13   conduct.

14           THE COURT:  So, in other words, you have evidence of

15   his involvement while on supervised release.  The evidence of

16   overt acts of violence may postdate his conclusion of

17   supervised release, but only by a month or two?

18           MS. KRAMER:  That is accurate, your Honor.

19           THE COURT:  Okay.

20           MS. KRAMER:  The proposed cosigners that the defendant

21   offered who purportedly know his character and believe he's not

22   a danger presumably are not his enemies, presumably have not

23   been on the receiving end of these threats or any of the

24   extortions that the defendant ordered or participated in, and

25   should not be given any weight whatsoever in a determination of

GAPHPARC

1   his danger.  His demonstrated record, his appetite and capacity

2   for violence, which was almost entirely demonstrated through

3   his direction to others, makes him a real danger under any set

4   of conditions that the Court could impose for pretrial

5   supervision.  He has given orders to others from the comfort of

6   his own home, from his restaurant.  Home detention would not in

7   any way mitigate that dangerousness.

8           The electronic monitoring that he proposes, the

9   cosigners, the bond, all address a risk of flight that is not

10  the government's primary concern here.  It's the danger to the

11  community and, as Pretrial Services indicated and the

12  government agrees, there is no set of conditions that could

13  protect the community from this defendant, as demonstrated from

14  his prior conviction, his conduct on supervised release, and

15  his conduct in this case.

16          Thank you, your Honor.

17          THE COURT:  Thank you, Ms. Kramer.

18          Mr. DeMarco, anything you'd like to say --

19          MR. DeMARCO:  Yes, Judge.

20          THE COURT:  -- in response?

21          MR. DeMARCO:  I'm sorry to interrupt you, your Honor.

22          THE COURT:  I said anything you'd like to say in

23  response?

24          MR. DeMARCO:  It's my understanding that the

25  consensual recordings in this case began in or about

GAPHPARC

```
1    December 2011, after Mr. Parrello was off supervised release,
2    which expired in May of 2011.
3              Now, the government speaks of Mr. Parrello's engaging
4    in gambling conduct while he was on supervised release, and
5    that was sometime in 2011, presumably before May of 2011.
6              THE COURT:  Well, presumably 2010, which is the
7    beginning date of the racketeering conspiracy.  But let me
8    interrupt you and just see if Ms. Kramer can clarify.
9              You're saying there were recordings of Mr. Parrello
10   engaged in gambling activity or discussions with others who are
11   engaging in the racketeering conspiracy?
12             MS. KRAMER:  Yes, your Honor.  The case originated
13   with some wiretaps that were obtained by the Westchester County
14   District Attorney's Office on a number of individuals' phones.
15   And one of those wiretaps, at least one, captured the defendant
16   engaging in gambling conduct while on supervised release in
17   2011.
18             THE COURT:  Okay.
19             MR. DeMARCO:  Judge, here's my question, and I don't
20   know if the government's prepared to answer it.  What is
21   engaging in gambling conduct?  Is a conversation by
22   Mr. Parrello with the friend saying:  Hey, did you see that
23   game?  I wonder if they covered the spread.  Who do you think's
24   going to win the World Series, the Cubs or the Indians?  It's a
25   very general term to say "he engaged in gambling conduct"
```

GAPHPARC

1  without proffering to this Court the contents of that

2  conversation.  I mean, what is gambling conduct?  I mean, and

3  how does one engage in gambling conduct that violates the

4  supervised release in this case?

5          THE COURT:  Well, if you want more specificity, I

6  think that's a fair question, but the indictment certainly

7  alleges gambling activity; right?  That's one of the predicates

8  for the crime, isn't it?

9          MR. DeMARCO:  Yes.  I'm more concerned about this

10 conversation that the government's alleging took place while he

11 was on supervised release and how he violated his supervised

12 release by engaging in this conduct and specifically what this

13 conversation was that the government alleges involves gambling

14 conduct while he was on supervised release.

15         THE COURT:  All right.  So, Ms. Kramer, I think that's

16 a fair question.  You raised it.  So what are you referring to?

17         MS. KRAMER:  Certainly, your Honor.  I would have to

18 speak with one of my colleagues to tell the Court which of the

19 six different illegal gambling schemes the defendant was

20 speaking about on the wiretap.  But the wiretap captured this

21 defendant, and many others, engaged in six different illegal

22 gambling schemes, one of which was an illegal casino-style card

23 club and five of which involved illegal sports gambling

24 operations in New York, Florida, and Costa Rica, principally

25 conducted using the Internet, either directly or through

GAPHPARC

1    others.

2            I would have to check with one of my colleagues, I'm

3    happy to do that, to tell the Court which one of those schemes

4    the defendant was engaged in on a wiretap recording.  But I can

5    represent right now that he was not discussing what happened in

6    a football game yesterday.  He was engaged in the business of

7    illegal gambling.  And I am happy to get more specific

8    information if it's necessary for the Court's determination of

9    the defendant's dangerousness.

10           THE COURT:  Look, I think it's relevant, certainly,

11   and Mr. DeMarco, I think, has a right to see those things which

12   the government's relying on and which the Court might rely on.

13   So they're all part of the discovery which, given the volume

14   and given the fact that we have a discovery coordinator and

15   some issues with the protective order, has been slow getting

16   out.  So I just adjourned the conference we were going to have

17   next week because it seemed pointless in light of the fact that

18   most of the discovery has not gone out.  But you're entitled to

19   that stuff, Mr. DeMarco, and you should have it shortly is my

20   assumption.

21           MR. DeMARCO:  I understand.  When the government

22   alleges Mr. Parrello was violating his supervised release with

23   conversations, I'm curious as to what those conversations were

24   specifically, not in a general sense.

25           THE COURT:  All right.  But, look, the indictment

GAPHPARC

```
1    alleges that he was part of a racketeering conspiracy that

2    dates back to 2010, which is the time period when he's on

3    supervised release.

4              MR. DeMARCO:  The conspiracy may date back to 2010,

5    your Honor.  That doesn't mean Mr. Parrello joined it while he

6    was on supervised release, your Honor.

7              THE COURT:  Okay.

8              MR. DeMARCO:  He could have joined it sometime after

9    his discharge --

10             THE COURT:  He could have.

11             MR. DeMARCO:  -- if at all.

12             THE COURT:  Well, he could have, but certainly there's

13   evidence before me that he's recorded in 2011.  So I think one

14   could say, yes, maybe he didn't join until after he got off the

15   supervised release.  The government in response to that

16   specific suggestion has said, no, he was intercepted even

17   before that.  It's not something they had relied on before.

18   They're responding to my questions.

19             So I think I don't want to be too critical of them,

20   because that's not something I think they're particularly

21   relying on.  You raised the point, and then I asked the

22   question.  But the indictment itself alleges a conspiracy that

23   dates back to when he was on supervised release, and the acts

24   of violence that are expressly alleged and relied on in the

25   government's letter are things that -- at least the earliest
```

GAPHPARC

1    one is in 2011, about a month or so after he's off of

2    supervised release.  So I think the inferences to be drawn are

3    that supervised release was not terribly effective at deterring

4    criminal conduct.  I mean, I think that's the inference one

5    would draw from the facts presented by the government if true.

6          But you had other points you wanted to respond to,

7    perhaps.

8          MR. DeMARCO:  Judge, what I want to say is that -- and

9    I apologize for repeating myself -- Mr. Parrello is presumed

10   innocent of all of the charges.

11         THE COURT:  Right.

12         MR. DeMARCO:  And all these allegations will be

13   proven, if at all, at a trial.  He is not a danger to the

14   community, and with the proper mechanisms put in place by this

15   Court, this Court could ensure that he would not be a danger to

16   the community.  And for this reason, we're asking that a bond

17   be granted by this Court.

18         THE COURT:  Okay.  Thank you.

19         Is there anything Pretrial Services would like to say?

20   I have the Pretrial Services report which concludes or

21   recommends that there are no conditions that would assure the

22   safety of the community and therefore recommends that

23   Mr. Parrello be detained.  Is there anything beyond what's in

24   the report?

25         OFFICER KESSLER-CLEARY:  No, your Honor.  That is the

GAPHPARC

1    recommendation of Pretrial Services as it stands.

2             THE COURT:  All right.  I'm prepared to rule.  I think

3    the package prepared by Mr. DeMarco and argued by Mr. DeMarco

4    is impressive.  I think Mr. DeMarco is a very fine lawyer.  I

5    know that from prior experience in other cases, and I think he

6    makes as strong a case as could be made for bail in this case

7    for Mr. Parrello.

8             However, I am persuaded that given the evidence

9    presented by the government, given the fact that Mr. Parrello

10   has a criminal history that includes a racketeering conviction

11   in this court that he was on supervised release for either

12   during or immediately before the commencement of this

13   conspiracy, he was previously detained in that other

14   racketeering case, given the nature of the violent acts, given

15   the nature of Mr. Parrello's role as the guy who's ordering

16   different acts of violence remotely, I think that the

17   government has established by clear and convincing evidence

18   that he is a danger and that there are no conditions that would

19   reasonably assure the safety of the community going forward.

20            So notwithstanding the fact there are a lot of people

21   who seem to know and like Mr. Parrello, that, I think, is

22   relevant but not dispositive.  So I'm going to respectfully

23   deny the request.

24            So, Mr. Parrello, I have to call them as I see them.

25   I'm the ump in a baseball game.  So that's the way I see it.

GAPHPARC

1   It looked to me that the evidence here establishes what the

2   government is suggesting it does.  That's not -- I mean, you're

3   not without prejudice to renewing a request if, when you have

4   the wiretaps, you can say that some of this stuff is

5   overstated.  You can always do that, Mr. DeMarco, as you know.

6   So I'll issue an order that just memorializes my ruling, but I

7   think the government has met the standard here.

8            Ms. Kramer, something you wanted to say?

9            MS. KRAMER:  I just wanted to say, your Honor, that I

10  will communicate with Mr. DeMarco and specifically direct him

11  to portions from the 2011 wiretap that are relevant.

12            While we are here, although I cannot find in my notes

13  a call with this defendant from the time period, on

14  February 18, 2011, a Luchese associate placed a call to

15  Genovese associate, and they discussed employing an individual

16  at this defendant's gambling club as security.  They refer to

17  him that he had -- they refer to this defendant as the big guy

18  and said they had to get his approval.

19            Similarly, on March 31, 2011 --

20            MR. DeMARCO:  I'm sorry, the first date?  I'm sorry.

21            THE COURT:  February.

22            MS. KRAMER:  February 11, 2011, at 4:06 p.m.

23            On March 31, 2011, at approximately 8:15 p.m., an

24  individual placed a call to Anthony Zinzi, another defendant in

25  this case.  They discussed dividing the money that was

1    collected at the casino club and talked about doing it at

2    Parrello's direction.

3          On April 7, 2011, there was another recorded call with

4    a bartender at Rigoletto in which the bartender said the big

5    guy, referring to defendant Patsy Parrello, wanted to see the

6    cooperating witness.  And they discussed subsequently -- the

7    cooperating witness placed a call to defendant Anthony Zenzi

8    talking about going to the restaurant, and they discussed a

9    problem with a gambling debt.  Thereafter, the cooperator,

10   after meeting with defendant Patsy Parrello at Rigoletto on

11   April 7, 2011, during his term of supervised release, the

12   cooperator described the meeting, talked about his fear of

13   Patsy Parrello, and the fact that there was going to need to be

14   some resolution of a dispute concerning a gambling debt.

15         So the government will obviously do a more thorough

16   review, but based just on the notes in front of me that were

17   referring to defendant Patsy Parrello, he was actively involved

18   in the charged conspiracy during his supervised release.  I

19   just wanted to put that on the record while we're all here,

20   your Honor.  Thank you.

21         THE COURT:  All right.  So that doesn't change my

22   ruling, obviously.  I do want to make clear that I have not

23   relied on the supplemental letter from the government.  I don't

24   think they establish what they need to establish to present a

25   sealed document and sealed facts that the Court would rely on,

GAPHPARC

1   and I don't think it's necessary, in any event.

2           All right.  Then, Mr. DeMarco, I directed you to file

3   the bail proposal, your October 11 letter, and you're going to

4   do that with redactions.  But it occurs to me, given how much

5   we've talked about the cosigners, the sheer number of them, and

6   some of the occupations, I guess I'd like you to address with

7   some authority whether or not there is -- whether the

8   presumption of open records has been rebutted with respect to

9   them.  I think there are cases certainly where this has come

10  up.  So if I give you a few days to do that --

11          MR. DeMARCO:  Judge, based on the Court's ruling, I'm

12  inclined to just file it without the redactions at this stage.

13          THE COURT:  File it without the redactions?

14          MR. DeMARCO:  Without the redactions.  I don't see the

15  need at this point.  My concern was --

16          THE COURT:  I thought you wanted to protect the

17  privacy of the cosigners.

18          MR. DeMARCO:  I did, but based on the Court's ruling,

19  I'm not so sure that's -- I'll look into it, Judge, either way.

20  Either I'll give you some authority for the redactions or I'll

21  file it without.

22          THE COURT:  Yes.  I'm anxious to get most of the

23  letter docketed quickly so that anybody who wants to look can

24  look.  To the extent that there's a debate or --

25          MR. DeMARCO:  If this is okay, your Honor, I'll file

GAPHPARC

```
 1    it today with the redactions, and I can always file it

 2    subsequently without.

 3              THE COURT:  Yes.  You think by Friday you could get me

 4    something, if you want to do redactions, that provides some

 5    greater authority --

 6              MR. DeMARCO:  Sure.

 7              THE COURT:  -- and make some arguments as to why it is

 8    that the presumption of open records is overcome?

 9              MR. DeMARCO:  Yes, sure.

10              THE COURT:  Good.  So I'll issue an order to that

11    effect just so it's on the docket.

12              MR. DeMARCO:  Thank you.

13              THE COURT:  As I said, we're not going to have this

14    conference on the 31st.

15              MR. DeMARCO:  Definitely off?

16              THE COURT:  That should be docketed.  Maybe it didn't

17    hit until this morning.  We're instead going to have our next

18    conference on December 9.  I think that's going to give more

19    time for counsel and the defendants to review the discovery,

20    which is voluminous.  The discovery coordinator is in the

21    process of collecting it all, copying it all, making it

22    available to the defendants in a form that can be used

23    efficiently by them.  So it's a little bit of heavy start-up

24    costs, but I think once it's then delivered, I think it will

25    enable defendants and counsel to review the materials much more
```

GAPHPARC

1    quickly and efficiently.  But I don't think we'd have much to

2    talk about on Monday.  I've issued that order, but since you're

3    here, I'm telling you.

4              All right.  Anything else we should cover today?

5              MR. DeMARCO:  No.  Thank you, your Honor.

6              MS. KRAMER:  Nothing from the government.  Thank you,

7    your Honor.

8              THE COURT:  Thank you all.  We thank the marshals, and

9    let me thank the court reporter as well and the pretrial

10   officer.  Thanks.

11             (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25