UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

   -v.-

PASQUALE PARRELLO,
  a/k/a "Patsy,"
  a/k/a "Pat,"

       Defendant.

16 Cr. 522 (RJS)

**Government's Sentencing Submission**

JOON H. KIM
Acting United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Amanda Kramer
Abigail Kurland
Jessica Lonergan
Max Nicholas
Jonathan Rebold
Lauren Abinanti (SAUSA)
Assistant United States Attorneys
   *Of Counsel*



*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 31, 2017

**BY ECF**

The Honorable Richard J. Sullivan
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

      Re:    **United States v. Pasquale Parrello**,
            16 Cr. 522 (RJS)

Dear Judge Sullivan:

      The Government submits this letter in connection with the sentencing of Pasquale Parrello, a/k/a "Patsy," a/k/a "Pat," currently scheduled for September 7, 2017, at 10:00 a.m. For the reasons set forth below, the Government respectfully submits that the Court should sentence Parrello within the stipulated United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range of 63 to 78 months of imprisonment.

## Background and Offense Conduct

      On August 2, 2016, a grand jury sitting in this District returned indictment 16 Cr. 522 (RJS) (the "Indictment"), charging Parrello and 45 co-defendants with participating in a racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d), among other charges. On May 15, 2017, Parrello pled guilty to a superseding information, S6 16 Cr. 522 (RJS) (the "Superseding Information"), charging him with three counts of conspiracy to commit extortion, each in violation of Title 18, United States Code, Section 1951. The conduct forming the basis of these charges is set forth below.

      **A.**    **Conspiracy to Extort Victim-1**

      From in or about November 2011 to in or about March 2014, Parrello, Israel Torres, Anthony Zinzi, and others participated in the extortion of Victim-1 over a $30,000 gambling debt.

      Victim-1 was a bookmaker and had a gambling club in Yonkers. Pasquale Capolongo's "professional" gambling customers won approximately $30,000 from sports wagers they placed in Victim-1's book. Victim-1 refused to pay the Capolongo gambling debt. A cooperating

1

witness ("CW-1"), at the direction of the Federal Bureau of Investigation ("FBI"), was working as an agent for Capolongo's gambling business and was responsible for collecting the money from Victim-1. CW-1 met with Parrello who agreed to assist CW-1 in the debt collection. Parrello ordered that Torres threaten Victim-1 on at least two different occasions. Parrello collected $30,000 from Victim-1 using threat of death or physical injury and kept approximately $28,000 for himself. CW-1 ultimately paid the $30,000 owed to Capolongo.

The following are examples of the offense conduct for this particular scheme:

On or about December 11, 2011, CW-1 met with Zinzi and attempted to meet Victim-1 in order to officially "pitch a beef" over the unpaid $30,000 debt to Capolongo. During the meeting, Zinzi said that Victim-1 was responsible for the money because he took the bets, and Zinzi agreed that Parrello was in charge (referring to who gave orders to CW-1 and Zinzi). Zinzi spoke with a friend of Victim-1, who indicated that the uncle of Victim-1 could possibly be representing Victim-1 while his father was incarcerated. Zinzi and CW-1 went to Victim-1's gambling club to find Victim-1, but Victim-1 was not there. Zinzi called Victim-1 to arrange a meeting with him at the pizzeria down the street from his club in Yonkers. Zinzi ultimately expressed concern about "being in someone else's backyard," and CW-1 called Victim-1 to reschedule the meeting before it happened. Zinzi and CW-1 were acting on orders given to them by Parrello.

On or about December 12, 2011, CW-1 met with Parrello and explained that Victim-1 was refusing to pay the debt despite CW-1's affiliation with Parrello. During this meeting, Parrello told CW-1 to take Torres with him to meet Victim-1 and send a message. CW-1 explained the situation to Torres, and Torres agreed to go.

On or about December 19, 2011, Parrello told CW-1 that no one came to see him on behalf of Victim-1. Parrello could not understand why no one came to see him after the message was sent by CW-1 and Torres that Victim-1 had to pay the debt. Later that day, Torres went with CW-1 to meet Victim-1 in a movie theater parking lot in Elmsford, New York. After speaking to Victim-1, Torres got back into the car with CW-1 and told CW-1 that he (Torres) had said the following to Victim-1: "You're in the big league. Come up two days, you better have the fuckin' money. If you don't, you know what's gonna happen. Now you're responsible for it. So use your fuckin' head because you're not gonna see me again. Somebody will see you, it ain't gonna be me…You're fucking white. If you were a fucking nigger, you'd be dead now."

On or about December 21, 2011, CW-1 met with Parrello in the basement area of Pasquale's Rigoletto ("Rigoletto"), a restaurant located in a building owned and operated by Parrello's wife where Parrello is the "unofficial maître d'." During this meeting, CW-1 explained to Parrello that the cousin of Victim-1 contacted CW-1 on behalf of Victim-1 and refused to pay the debt owed to Capolongo. CW-1 also reported to Parrello that Torres had told Victim-1 to pay the money by that day.

On or about December 22, 2011, CW-1 met with Parrello and Victim-1's uncle in the basement area of Rigoletto. During this meeting, Victim-1's uncle apologized repeatedly to Parrello for the actions of his son, Victim-1's cousin, and for the situation with Victim-1. The

2

uncle told Parrello that he was watching out for Victim-1 while his father was in prison, that Victim-1's father left him "five or six sheets" of bettors to take wagers for sports games, and that many of these bettors lost and are not paying Victim-1, which is why Victim-1 has not paid Capolongo for his winnings. Parrello warned the uncle that sooner or later there would be a beef over this Victim-1 debt and asked the uncle who was responsible for Victim-1. Immediately after this meeting, CW-1 placed a call to Capolongo to report to him what happened with the uncle and Parrello.

On or about January 16, 2012, CW-1 met with Parrello at Rigoletto. During this meeting, CW-1 reported to Parrello that CW-1 had met with Capolongo when Capolongo visited New York from Florida and that Capolongo had passed along a message from another coconspirator ("CC-3"). CW-1 told Parrello that CC-3 said that if the Victim-1 debt did not get paid, Parrello and CW-1 would "have a problem" and that Parrello and CW-1 should "stop embarrassing themselves." Parrello mentioned that someone had been to Rigoletto to see Parrello on behalf of CC-3 and that he found it hard to believe that CC-3 would send a message like that because "he (CC-3) knows better." On or about January 19, 2012, CW-1 met with Parrello, and it was apparent that the Victim-1 debt had still not been paid. Parrello instructed CW-1 to meet with Victim-1's uncle and demand $10,000 by the upcoming Saturday and then an additional $5,000 on a weekly basis thereafter. Parrello told CW-1 that he did not care if the uncle's family members were dying. Parrello wanted the money that Victim-1 owed. After receiving these instructions, CW-1 met with the uncle at a bowling alley in Yonkers, New York, during which meeting the uncle turned down Parrello's demand and stated that he did not have anything to do with Victim-1's debt but would be down to the restaurant to see Parrello during the coming week.

On or about January 24, 2012, CW-1 met with Victim-1's uncle who indicated that Victim-1 and his bookmaker were going to be represented by Conrad Ianniello.

On or about March 12, 2012, CW-1 met with Alex Conigliaro and Frank Barbone on behalf of Parrello. Barbone and Conigliaro told CW-1 to remind Parrello about the upcoming meeting at Valbella Restaurant with Ianniello. Barbone told CW-1 that Ianniello had collected $1,000 for Parrello toward the Victim-1 debt and that he was expecting approximately "ten or twelve more." Also on or about March 12, 2012, CW-1 met with Parrello and Torres at Rigoletto. During these meetings, Parrello told CW-1 to have Torres choke Victim-1's cousin to collect the money. Specifically, Parrello told CW-1 to get Torres "and let Buddy go there and choke him, choke him. I want Buddy to choke him, choke him, actually choke the motherfucker…and tell him, 'Listen to me…next time I'm not gonna stop choking… I'm gonna kill you.'"

On or about March 27, 2012, CW-1 and Parrello went to a meeting with Ianniello, Barbone, Conigliaro, and others at the Valbella Restaurant in Manhattan. During this meeting, Ianniello gave Parrello $10,000 that he had collected toward the Victim-1 debt.

On or about April 30, 2012, at the request of Parrello, CW-1 and Vincent Terracciano met with Victim-1's cousin and another male at Victim-1's card club on Saw Mill River Road in Yonkers, New York, to deliver a message from Parrello. At the direction of Parrello, CW-1

3

demanded that Victim-1's uncle meet with Parrello on the following Wednesday. Victim-1's cousin agreed to deliver the message to his father. Terracciano threatened Victim-1's cousin by saying "better that he comes there than we come to his house, you know what I mean?"

On or about May 1, 2012, CW-1, Terracciano, and Harold Thomas (to whom Victim-1 also owed a debt of an additional $14,000) met with Victim-1 and Victim-1's cousin at the Homefield Bowling Alley parking lot in Yonkers, New York. During this meeting, Thomas demanded payment of the $14,000 owed to him by Victim-1, and CW-1 demanded that Victim-1 meet with Parrello. On or about this same day, CW-1 met with Parrello and Zinzi at Rigoletto. Parrello told CW-1 to get Victim-1's uncle to meet with Parrello that night. Parrello told CW-1, "We don't take no for an answer."

On or about May 11, 2012, CW-1 met with Victim-1's uncle at Homefield Bowling Alley in Yonkers, New York. During this meeting, the uncle paid CW-1 $9,000 toward the Victim-1 debt. CW-1 then brought the $9,000 to Rigoletto and gave it to Parrello. Parrello gave $400 of the collected $9,000 to Torres for his assistance and kept the rest for himself.

On or about February 27, 2013, at the direction of Parrello, CW-1 and a coconspirator ("CC-4") met with Victim-1's cousin and Victim-1 on 187th Street in the Bronx, New York. During this meeting CW-1 and CC-4 confronted Victim-1 about Victim-1 running a card game and not performing the duty of providing Parrello with money from the game. An argument ensued and Victim-1's cousin assaulted CW-1, who defended himself. On or about February 28, 2013, CW-1 met with Parrello at Rigoletto. During this meeting, CW-1 and Parrello discussed the altercation from the day before. Parrello told CW-1 that Victim-1 was "put with" Parrello after Ianniello went to jail, and that he felt that Victim-1's cousin and uncle used Parrello for his power and then never came to pay Parrello money. Parrello further told CW-1 to leave the situation alone because Victim-1's uncle promised Ianniello money from the card game when Ianniello was released from jail.

On or about January 16, 2014, CW-1 met with Capolongo at the Isle of Capri Pompano Park Casino in Florida. During this meeting, Capolongo told CW-1 that he had spoken to Victim-1's father, who was no longer incarcerated (as of November 2013) and that Victim-1 told Capolongo that he knew that he owed Capolongo the gambling debt.

After Victim-1's father was released from jail, on or about January 24, 2014, CW-1 met with Torres and Parrello at Rigoletto. During this meeting, Torres told CW-1 that Victim-1's father had contacted Torres with regard to the gambling debt. Parrello instructed CW-1 to arrange a meeting with Victim-1's father and Parrello at the bowling alley in Yonkers. Parrello told CW-1, "I don't give a fuck what he's doing. I want to see him." CW-1 confirmed with Parrello that Victim-1 still owed $10,000 and then contacted Victim-1 to arrange the meeting for the following Monday.

On or about January 27, 2014, CW-1 met with Parrello at Parrello's residence. During this meeting, CW-1 informed Parrello that Torres told CW-1 that a coconspirator ("CC-6"), who was representing Victim-1's father, would be visiting Parrello at Rigoletto regarding the remaining $10,000 of the Victim-1 debt.

4

On or about March 7, 2014, CW-1 met with Parrello at Parrello's residence. During their conversation, Parrello told CW-1 that the remaining $10,000 was going to come from CC-6 and that CC-6 paid Parrello $5,000 up front and agreed to pay $800 per month until the remaining $5,000 was paid. Parrello gave CW-1 $800 at this meeting. Also during this meeting, CW-1 told Parrello that he had been paying $500 per month to Capolongo for the Victim-1 debt over the past few years and that he still owed Capolongo $8,000.

On or about March 31, 2014, CW-1 met with Capolongo at the Okeechobee Steakhouse in Florida. During this meeting, using funds provided by the FBI and under FBI supervision, CW-1 made a final payment to Capolongo of $6,000 for the debts owed to him.

### B. Conspiracy to Extort Victim-2

Victim-2 was a gambler and was also in the business of gambling. Victim-2 incurred a debt of approximately $16,204 in connection with his gambling. CW-1 was responsible for the debt because CW-1 acquired the gambling accounts for Victim-2. Parrello, Torres, Zinzi, and othesr worked together to extort Victim-2 for the debt.

On or about October 10, 2012, CW-1 met Parrello at Rigoletto and discussed the Victim-2 debt. During the conversation, Parrello wanted to know how CW-1 made out with Victim-2. Parrello then instructed CW-1 and others to puncture Victim-2's tires with an ice pick:

> [Y]ous go there and yous get this motherfucker. Get your money, get your mother fuckin' money. Knock on his mother fuckin' door where he lives over there and tell him I want my fuckin' money.
>
> * * *
>
> [C]ut his fuckin tire. That way he has to change the tire. So then you know you can catch up with him. Give him a flat. Take the air out of the tire, whatever the fuck you got to do. Then you catch up with him because then he's there, ya know, he's got to get it fixed, he can't go nowhere, and then you surround the mother fucker. That's how yous do it.

Parrello further stated: "Go ahead, get this motherfucker. Don't make a mistake. Get your fuckin' money."

At the restaurant and before CW-1 left, Zinzi gave CW-1 an icepick, which is currently in FBI custody. CW-1 and Vazzano went from Rigoletto to Victim-2's home in the Bronx in Vazzano's car. On the way to Victim-2's home, CW-1 met Torres outside of Torres's home. CW-1 told Torres about what Parrello had said. Torres in turn instructed CW-1 on how to approach Victim-2's home and intimidate Victim-2. Specifically, Torres stated:

> [T]his is what you do . . . Go to the door . . . Ding, dong, ding, dong. . . Someone's going to answer the door. . . where's [Victim-2] we got to speak to him. We got a

message for him.  Understand, you have a message for him.  OK, he comes down, step outside, I don't want to talk in the house.  [Victim-2] says, 'I don't want to go outside, what's up, what's up?'  Step outside, I don't want to talk in the house.  Understand, now he's not gonna do that, or he's gonna (UI).  So, what you do, let him know, then you go to a tire, get a pick, and you do all his fuckin' tires.  And you got to do it. . . . Don't say nothing.  Go to the door, nice nice.  And if he's not there . . . then you start doing.  That's going to be the start of the harassment.

Torres then showed CW-1 where to puncture the tire and noted that "[Victim-2's] minds going to go a psychological deal, his minds going to go crying.  Ok, next time, you get a fuckin' boulder . . . and throw it right through, no seriously, you throw it through the fuckin' window."  Torres further counseled: "But you do it with confidence. . . . don't show that you're afraid or nothing.  You go like this, ding dong, you say like what's up, what are you doing with this money?  You gonna pay this here?  My friend wants this paid now, now, you have it now.  He'll go like this 'Give me a little chance.'  Do you have it now yes or no?  You don't have it now, OK, then you start doing your harassment shit."

CW-1 then left Torres's home and picked up a coconspirator who is now deceased ("CC-1"), and CW-1, Vazzano, and CC-1 went to Victim-2's home.  They parked near Victim-2's home; CW-1 remained in the car, and CC-1 went and knocked or rang the bell, and Victim-2's girlfriend (the "Girlfriend") answered and said that Victim-2 was not home.

That night, Vincent Casablanca called CW-1 and said that the Girlfriend's father (the "Father") had called Casablanca to complain about CC-1 going to the Girlfriend's house looking for Victim-2.  When CW-1 subsequently told this to Parrello, Parrello said, "Fuck them, don't worry about it."  When CW-1 told Torres, Torres stated, "Don't worry about nothing, if these mother fuckers want to get fuckin' stupid, we'll get the fuckin' pistols, and we'll do what the fuck we got to do.  They don't know me here.  Let this happen. . . . we're not punks. . . we're gonna do the damage. . . we do what we got to do."  Torres was also angry that Casablanca was talking on the phone and being careless.

On or about October 12, 2012, an individual ("Individual-1") went to Rigoletto to meet Parrello after the Father complained to Individual-1 about the incident.  Although CW-1 was not present for the conversation between Parrello and Individual-1, after it concluded, Parrello relayed the substance of the conversation to CW-1.  According to Parrello, Individual-1 offered to settle Victim-2's debt for $10,000, but Parrello refused.  Then on or about December 27, 2012, Parrello told CW-1 to take Torres to find Victim-2; the next day, Torres and CW-1 conducted surveillance on Victim-2's home.  In the car, Torres instructed CW-1 on how to stalk and confront Victim-2.

On or about the same day, CW-1 was present for a conversation between Torres and Casablanca wherein they discussed the Victim-2 debt and the Father's displeasure at CC-1 going to his daughter's house looking for Victim-2.  Torres stated, in sum and substance, that the bottom line was that Victim-2 owes the money:

6

> Ya know, I don't know what he wants to do, if he wants to hide behind someone's skirt, he could do that all his life, but that's not going to help him, but over here [Victim-2's house], that's off limits, we understand that, somewhere else is not off limits. . . . And one way or another he's gonna pay it.

Casablanca subsequently tried to broker a deal in which Victim-2 would pay CW-1 $400 per week. During a conversation on or about November 20, 2012, Parrello rejected this potential deal. CW-1 then asked Parrello if Parrello wanted CW-1 to go with Casablanca to see the Father to discuss the Victim-2 debt. Parrello responded:

> [T]he [Father's] not going to talk to you. . . .You can't do that. I won't let you do that. . . . Don't let them guys know my business, I don't want them to know my fuckin' business. They offered $400. . . . tell [Individual-1] thank you. . . . tell him Patsy says, I love you, Patsy loves you, but he'll [Parrello] will get in touch with [the Father] himself.

On or about November 20, 2012, CW-1 and CC-1 updated Zinzi regarding the deal Individual-1 attempted to broker to settle Victim-2's debt, including the proposed weekly payments of $400.

Then, on or about December 27, 2012, Parrello instructed CW-1 to take Torres to see Victim-2 and that Parrello would tell Torres what to say to Victim-2. The next day, on or about December 28, 2012, CW-1 met Torres to confront Victim-2. CW-1 gave Torres a physical description of Victim-2 and they drove to Victim-2's home. Torres stated, in sum and substance, that he was going to watch Victim-2 at different times so that Torres could learn Victim-2's routine. Torres then called Victim-2 a scumbag for not paying and putting Victim-2's family in "harm's way." Torres also discussed taking a bat to Victim-2 and blasting Victim-2 across Victim-2's chest.

On or about April 15, 2013, CW-1 met with Balsamo to discuss Victim-2's debt. CW-1 relayed to Balsamo that Parrello had accepted the offer of weekly payments of about $100 from Victim-2.

On or about April 22, 2013, CW-1 met with Balsamo, Victim-2, and CC-1 at Bistro 6 in the Bronx. Balsamo stated: "I want everybody to be careful talking in the place . . . because, ya know, they picked up my brother-in-law . . . yea, my brother-in-law got pinched." Balsamo told Victim-2 that Victim-2 could make a move only if CW-1 said that it was okay. Ultimately, Victim-2 agreed to pay CW-1 about $150 per week. When CW-1 relayed the deal to Parrello, Parrello agreed but made sure that CW-1 made clear that the $150 per week was temporary and that if Victim-2 started earning more money than Victim-2 would have to pay more towards his debt. So long as the payments were on time, Parrello agreed to call off Torres.

On or about April 23, 2013, CW-1 introduced Victim-2 to a special agent with the FBI acting in an undercover capacity ("UC-1"). Victim-2 subsequently informed UC-1 that Victim-2 was scared of CC-1. From in or about May 2013 through in or about November 2013, Victim-2

7

made approximately 11 separate payments to UC-1 and to CW-1. In total, Victim-2 paid approximately $3,800 in denominations that ranged between $150 and $600.

      **C.**      **Conspiracy to Extort Victim-3**

In or about August 2012, Pasquale Maiorino, a/k/a "Patty Boy," was on law enforcement supervision and asked a coconspirator who is now deceased ("CC-1") and CW-1 to collect a $40,000 debt on his behalf from an individual who managed a bar in Westchester ("Victim-3"). For every $10,000 that they collected, CC-1 and CW-1 would get to keep $2,000. CC-1 went to Parrello to get permission to collect money on Maiorino's behalf. CC-1 used the name "Patty Boy," when speaking with Parrello about Maiorino, but initially Parrello mistakenly believed that they were talking about another individual who also used the nickname "Patty Boy." Parrello said that they could help collect the money and that Victim-3 has "gotta pay."

On or about August 20, 2012, after speaking with Maiorino, CC-1 and CW-1 went to Victim-3's home and business. CW-1 told Victim-3 that the "little guy" [Maiorino] wants $15,000 by the weekend and then $5,000 a week; CC-1 said that the "big guy [Parrello] said … you gotta pay." Victim-3 told CC-1 and CW-1 that he did not have any money to pay to Maiorino, but that another person ("Individual-2") owed Victim-3 money. CC-1 explained that Parrello "made a decision, I would very, very, very much advise you not to go against it." Victim-3 responded, "I got it, that's it, that's like the judge putting the fuckin' guilty 20 years, have a nice life."

The same day, CC-1 and CW-1 told Maiorino that Victim-3 told them to collect the money from Individual-2 instead. Maiorino responded, "And he [Victim-3] should have got slapped."

A few days later, Maiorino stated that CC-1 and CW-1 should tell Victim-3 that they would put gambling machines or a sports betting clerk in his bar to take bets as a way of making money to repay Maiorino. They continued the discussion about two later, on or about September 6, 2012. Maiorino said that he was going to put "6 [slot] machines" in Victim-3's bar. Maiorino explained that in talking with Victim-3, CC-1 and CW-1 had to be "firm, you have to be assertive. You can't show the fangs, but you got to know the fangs are there. . . . [Y]ou can growl a little bit … and then you say, listen to me. You're getting yourself into a pickle you're not going to be able to get out of … This is no joke now."

The following day, on or about September 7, 2012, Maiorino, CC-1, and CW-1 spoke with Victim-3 by phone; Victim-3 told them that Individual-2 had not repaid him any of the debt. After ending the call, Maiorino said that they could play nice but they still had to tell Victim-3 that he was "making me look like a fucking monkey." CW-1 reached out to Individual-2 and arranged a meeting at Nathan's. Maiorino, CC-1, and CW-1 went to Nathan's. Maiorino stayed in the bathroom, while CC-1 and CW-1 met with Individual-2, who told them that he took a $15,000 loan from Victim-3 and had repaid $7,000, but that he did not owe Victim-3 $100,000, as Victim-3 claimed. Victim-3 called Individual-2 and told him not to give any money to CC-1 and CW-1. CC-1 and CW-1 informed Maiorino, who said that they should hurt Victim-3. Maiorino said that he wanted to get Victim-3 "isolated" and asked CC-1 and CW-1 if they have

ever used a "zapper" (stun gun).  Maiorino further explained that they should "fuck him [Victim-3] up, fuck him up bad."  Specifically, Maiorino stated that if they found Victim-3 alone, they should "hold the back of his head and nail his fucking jaw."  Maiorino said that they should tell Victim-3, "We're coming to that fucking bar tomorrow, we're starting up in there … You don't have a fucking choice here … You're going to pay … We may take the fucking bar from you … I'll bring a fucking army tomorrow."

The same day, after CC-1 and CW-1 went back to Victim-3's bar, CC-1 received a call on Victim-3's behalf; CC-1 learned that that there would have to be a meeting the following day.  CW-1 told Victim-3 that Victim-3 made a "big mistake" going over "Patsy [Parrello]'s head."  Victim-3 suggested that he could pay Maiorino $2,500 per month for a year.

CW-1 and CC-1 informed Maiorino, who rejected the $2,500 per month offer and told them to return to Victim-3's bar to figure out where they could put gambling machines and a sports betting clerk.  Maiorino stated, "I'm a firm believer use logic and reason and when all else fails, God hope they have medical insurance."  A few days later, Victim-3 rejected the idea of having a sports betting clerk in the bar.

On or about September 14, 2012, CC-1 and CW-1 learned that people were looking for CC-1 in relation to their attempts to collect money from Victim-3.  When Parrello learned about the situation, he said that CC-1 and CW-1 could no longer be involved in collecting the debt from Victim-1.  The same day, Parrello also realized that he had been mistaken about the identity of "Patty Boy," believing that CC-1 and CW-1 were talking about another person, when they were actually referring to Maiorino.

CC-1 and CW-1 met with Maiorino on City Island and told him that Parrello said that they could no longer help Maiorino collect the debt.  Maiorino responded that he had asked John Spirito to help him.

About a month later, in or about October 2012, Maiorino reported that he had resolved the Victim-3 situation.  Another individual paid approximately $30,000 toward Victim-3's debt.

### Parrello's Guilty Plea and PSR

On May 15, 2017, Parrello pled guilty before the Honorable Sarah Netburn, United States Magistrate Judge for the Southern District of New York, pursuant to a plea agreement (the "Plea Agreement"), to Counts One through Three of the Superseding Information.  (PSR ¶ 6).  Pursuant to the Plea Agreement, the parties stipulated that, among other things, Parrello's Sentencing Guidelines range was 63 to 78 months of imprisonment.  (*Id.*)

Regarding the Guidelines, the parties stipulated in the Plea Agreement, pursuant to U.S.S.G. §§ 3D1.1(a) and 3D1.2, that a multiple count analysis must be performed and that each offense constitutes its own separate group for Guidelines purposes.  For each of Groups One, Two, and Three, pursuant to U.S.S.G. § 2B3.2(a), the base offense level is 18.  In addition, the parties agreed that the offense level for each Group is increased by three levels because the offense involved an express or implied threat of death, bodily injury, or kidnapping and because the loss demanded involved more than $20,000 but less than $95,000, pursuant to U.S.S.G.

§§ 2B3.2(b)(1), 2B3.2(b)(2), and 2B3.1(b)(7)(B).  The parties further agreed that the offense level for Groups One and Three is increased by another three levels because the defendant was a manager or supervisor of those conspiracies, which involved five or more participants or were otherwise extensive, pursuant to U.S.S.G. § 3B1.1(b).  Finally, the offense level for Group Three is increased by another three levels because a dangerous weapon was possessed, pursuant to U.S.S.G. § 2B3.2(b)(3)(v).  Accordingly, the offense level for Group One is 24, for Group Two is 21, and for Group 3 is 26.  After applying the Grouping Rules set forth in U.S.S.G. § 3D1.4, the combined offense level for Groups One through Three is 29.  (*Id.*)

The parties further agreed that because of the defendant's guilty plea, he should receive a three-level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1.  Therefore, at the time of the plea, the parties agreed that the applicable Guidelines offense level would be 26.  Because, however, a near-global plea by the defendant and a significant number of codefendants at this early stage of the proceedings conserved substantial resources for the Government and the Court, the parties agreed that, pursuant to Title 18, United States Code, Section 3553(a), a downward variance equivalent to a one-level decrease in the offense level is appropriate.  With this one-level decrease, the offense level is 25.  (*Id.*)

Regarding criminal history, the parties stipulated that the defendant has three criminal history points and is in Criminal History Category III.  (*Id.*)  Accordingly, the parties agreed that the Guidelines range for Counts One through Three is 63 to 78 months' imprisonment.  (*Id.*)

The Probation Department, unlike the parties, also assessed three leadership points for Group Two.  (*Id.* ¶ 88).  This change, however, did not affect the overall offense level calculation.  (*Id.* ¶ 146).  Ultimately, the Probation Department calculated an offense level of 26 (before the downward variance), a Criminal History Category of III, and a Guidelines range of 70 to 87 months' incarceration.  (*Id.* ¶¶ 75-113; 145).

## Discussion

Regarding the Court's contemplated sentence, the Government submits that a sentence within the stipulated Guidelines range of 63 to 78 months is appropriate for Parrello.  Although the Guidelines no longer play a mandatory role at sentencing, they nevertheless continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways."  *United States* v. *Booker*, 543 U.S. 220, 252 (2005).  "Pursuant to the 'remedy opinion' [in *Booker*], the now advisory Guidelines are to be considered together with the other factors set forth in 18 U.S.C. § 3553(a), by judges fashioning sentences."  *United States* v. *Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006); *see also Booker*, 543 U.S. at 261-62.  Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall* v. *United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings.  *Id.* at 596; *see also United States* v. *Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006) (the Guidelines "'cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many

10

judges.'") (quoting *United States* v. *Jiminez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (*en banc*)); *see also Fernandez*, 443 F.3d at 33-34 ("It was not error for the [District Court] to employ the Guidelines range as a starting point and then to determine whether the arguments presented pursuant to the § 3553(a) factors warranted 'lighten[ing]' of . . . or fashioning of 'an alteration to' . . . the advisory Guidelines sentence").

The Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *Fernandez*, 443 F.3d at 27; *see also Kimbrough* v. *United States*, 552 U.S. 85, 108-09 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'") (quoting *Rita* v. *United States*, 551 U.S. 338, 350-51 (2007)).

In this case, a particularized consideration of the factors set forth in Section 3553(a) demonstrates that a Guidelines sentence is appropriate for Parrello. In particular, the Government is most troubled by the violence of the extortion conspiracies, the defendant's leadership role, and his recidivism despite his prior significant term of incarceration.

As the offense conduct set forth above makes clear, the crimes to which Parrello pled were both serious and violent. *See* 18 U.S.C. § 3553(a)(2)(A) ("the seriousness of the offense"). While Parrello himself did not commit or directly threaten any violence, he directed others to do so on his behalf. Parrello's instructions were explicit:

> [Y]ous go there and yous get this motherfucker. Get your money, get your mother fuckin' money. Knock on his mother fuckin' door where he lives over there and tell him I want my fuckin' money.
>
> * * *
>
> [C]ut his fuckin tire. That way he has to change the tire. So then you know you can catch up with him. Give him a flat. Take the air out of the tire, whatever the fuck you got to do. Then you catch up with him because then he's there, ya know, he's got to get it fixed, he can't go nowhere, and then you surround the mother fucker. That's how yous do it.

(October 10, 2012).

Moreover, Parrello repeatedly made clear that his messengers were to communicate that the recipients ignored his messages at their peril: Parrello told CW-1 that he did not care if the uncle's family members were dying. Parrello wanted the money that Victim-1 owed. (January 19, 2012); "We don't take no for an answer." (May 1, 2012); "I don't give a fuck what he's doing. I want to see him." (January 24, 2014). And the fact that the orders came from Parrello had weight. After CC-1 explained to Victim-3 that Parrello "made a decision, I would very, very, very much advise you not to go against it," Victim-3 responded, "I got it, that's it, that's like the judge putting the fuckin' guilty 20 years, have a nice life." (August 20, 2012). Parrello

11

used his coconspirators to exert influence and collect debts on his behalf without ever having to leave Rigoletto. Rather, his name in and of itself carried sufficient weight that his victims complied to his demands without ever seeing Parrello in person. When Parrello's subordinates appeared on his behalf and threatened violence in Parrello's name, the victims knew that those threats had teeth and would be carried out. Faced with the very real potential of violence, the victims had no choice but to pay their gambling debts. In this way, Parrello was able to terrorize debtors by proxy.

Such conduct is rendered all the more troubling by its similarity to the offense for which Parrello was sentenced in 2003 to 88 months' imprisonment and 3 years' supervised release. (PSR ¶¶ 109-10). In that case, the defendant pled guilty to participating in a racketeering conspiracy as a Soldier in the Genovese Crime Family and the acting Capo of the Parrello Crew. (*Id.*) The illegal activities of the Parrello Crew, which he supervised and coordinated, included extortion, among other crimes. (*Id.*) Despite a sentence of more than eight years, Parrello returned almost immediately to the type of conduct for which he was previously convicted, demonstrating a substantial lack of remorse and a need for significant individual deterrence. The defendant's recidivism counsels in favor of a substantial term of incarceration both to deter the defendant from committing future crimes and, critically, to protect the public. The defendant has shown that he poses a grave threat even from the confines of Rigoletto—where many of the meetings in the instant investigation occurred—or his home. *See* 18 U.S.C. §§ 3553(a)(2)(B) ("afford adequate deterrence to criminal conduct") & 3553(a)(2)(C) ("protect the public from further crimes of the defendant").

In support for his request for a below-Guidelines sentence, the defendant relies principally on two grounds—(1) his generosity to his family and friends and (2) his age and poor health. Neither of these factors merits the variance that the defendant seeks. While the defendant is entitled to some consideration for his financial gifts to family and friends, the defense submission does not put these acts into context. The money that the defendant bestowed on others was very likely, at least in part, the proceeds of the crimes that he committed. Moreover, these gifts were not selfless. By endearing himself to the community, the defendant created an environment in which he could commit crimes openly and with impunity—from the restaurant bearing his name—without fear that he would be reported by members of the public. He bought the community's silence. And its support should he ever need it, such as at the instant sentencing proceeding.

There is simply no merit to the defendant's contention that his current age and health "seriously erode his capacity to threaten society." (Def. Ltr. 11). The defendant participated in the instant extortions only a few years ago, when he was in his late 60s. As discussed above, given the defendant's leadership role, he had no need to step outside of Rigoletto to commit these crimes. Rather, he sent subordinates on his behalf who used the power of Parrello's name to coerce victims into paying their gambling debts. As Parrello himself has demonstrated, there is no need to be young or in good health to command others to commit crimes on one's behalf. Rather, Parrello continues to pose a grave threat to society despite his age and physical condition. Parrello's own record of recidivism and his age at the time of the instant offense renders absurd his assertion that he is "radically less likely to commit further crimes than the typical person." (Def. Ltr. 11).

Moreover, the defendant has not demonstrated that his physical impairments are "extraordinary" or present to an "exceptional degree." Rather, Parrello's health concerns appear, unfortunately, typical of someone of his age. Nothing in the record suggests that these health issues cannot be monitored, managed, and treated during the defendant's incarceration.

That said, the defendant certainly has faced challenges in his life. His failure to finish high school so that he could start working to provide for his family, the death of his son and his sister, and his poor health should all be considered in fashioning an appropriate sentence. (PSR ¶¶ 119, 121, 123, 128-29.). Yet it also bears noting that the defendant has had many benefits others do not have—a stable childhood (PSR ¶ 120); a supportive relationship with his wife and daughter, (PSR ¶ 122, 124); a long history of employment, (PSR ¶ 134-37); and access to substantial resources, as reflected in his house, his real estate company, and his wife's commercial property, (PSR ¶¶ 126, 134). Rather than rely on his family, his employment, and his other sources of lawful income, the defendant opted to again and again return to illegal activity. This choice demonstrates that substantial deterrence is necessary to send a message to the defendant and others that participating in violent extortions will result in significant punitive consequences. Accordingly, to provide just punishment, to promote respect for the law, and to deter the defendant and others from future unlawful conduct, a sentence in the Guidelines range of 63 to 78 months is warranted.

The defendant also requests to be released on bail to address his dental health. For the reasons outlined above—the violence of the defendant's conduct, his demonstrated ability to commit crimes from the confines of Rigoletto and his home, and his history of recidivism—the Government submits that the defendant poses a danger to the community that cannot be ameliorated by the defendant's proposed bail package.

**Conclusion**

      For the foregoing reasons, the Government submits that a sentence within the range of 63 to 78 months is sufficient but not greater than necessary to meet the purposes of sentencing.

      Respectfully submitted,

JOON H. KIM
Acting United States Attorney

By: *Jessica Lonergan*
Amanda Kramer
Abigail Kurland
Jessica Lonergan
Max Nicholas
Jonathan Rebold
Lauren Abinanti (SAUSA)
Assistant United States Attorneys
Southern District of New York
(212) 637-2478 / 2955 / 1038 / 1565 / 2512

cc:    Mark S. DeMarco, Esq. (via ECF)
       Kevin B. Faga, Esq. (via ECF)