H971pars

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                    16 Cr. 522 (RJS)

PASQUALE PARRELLO,

                Defendant.            Sentencing

------------------------------x

                                      New York, N.Y.
                                      September 7, 2017
                                      10:33 a.m.


Before:

                HON. RICHARD J. SULLIVAN,

                                      District Judge


                        APPEARANCES

JOON H. KIM
     Acting United States Attorney for the
     Southern District of New York
BY:  JESSICA R. LONERGAN
     ABIGAIL S. KURLAND
     JONATHAN REBOLD
     Assistant United States Attorneys

MARK S. DeMARCO, ESQ.
     Attorney for Defendant

KEVIN B. FAGA, ESQ.
     Attorney for Defendant

H971pars

1          (Case called)

2          THE COURT:  Okay.  Have a seat.  Thank you.

3          All right.  Good morning.  Let me take appearances

4     from counsel.  For the government?

5          MS. LONERGAN:  For the government, Jessica Lonergan,

6     Abigail Kurland, and Jonathan Rebold.  Good morning, your

7     Honor.

8          THE COURT:  Good morning to each of you.

9          And for the defendant?

10         MR. DeMARCO:  Good morning, your Honor.  Mark DeMarco

11    and Kevin Faga for Mr. Parrello.

12         THE COURT:  Good morning, Mr. DeMarco, Mr. Faga, and

13    Mr. Parrello, good morning to you.

14         THE DEFENDANT:  Good morning, Judge.

15         THE COURT:  And we have a lot of people here, friends

16    and relatives, so thank you for being here.  Many of you wrote

17    letters to the Court, which I read, so thank you for doing that

18    also.  I read all the letters, and it's helpful to get letters

19    like the ones that you wrote that give me insights into a

20    person that I've never really met.  I've seen Mr. Parrello a

21    few times in court, but I can't claim to know him.  So thank

22    you for doing that, and thank you for being here today.  I'm

23    sure your presence means a great deal to him.

24         Mr. Parrello, are you hearing okay?

25         THE DEFENDANT:  No.  I have a little trouble hearing,

H971pars

1    so I have to push the ear a little bit this way so I can hear

2    you.

3            THE COURT:  All right.  If you're having any

4    difficulty, let me know.  I'm going to try to make sure I speak

5    into the microphone.

6            THE DEFENDANT:  Yes.

7            THE COURT:  The acoustics are challenging in here even

8    under the best of circumstances.  But if you're having

9    difficulty, let me know.

10           THE DEFENDANT:  Yes.  Thank you, your Honor.

11           THE COURT:  And I'll make sure the lawyers also speak

12   into the microphones, both for your benefit and the benefit of

13   people who are here, because this is a public courtroom.

14   Everybody's welcome here.  That's the way we do things here in

15   the United States.  We have open proceedings that anyone from

16   the public can walk in and watch.  We take it all down with a

17   court reporter and transcribe it so that these proceedings are

18   completely transparent.  And it works better if people can

19   understand what's being said.

20           So, all right.  We're here for sentencing.

21   Mr. Parrello pled guilty before the magistrate judge, before

22   Magistrate Judge Netburn.  And so I accepted the guilty plea a

23   few weeks after that, but I wasn't here for that plea.  I

24   usually take my own pleas, but I think we were in such a rush

25   to get pleas done because of an offer by the government that

1    required about 40 defendants to plead guilty within a two-week

2    span that it was necessary to have some done by the magistrate

3    judges, and so that's what happened here.

4           I want to go over with you what I have reviewed in

5    connection with sentencing, and if I've left anything out, of

6    course, let me know.

7           So first of all, I've reviewed the transcript of the

8    guilty plea that was before Judge Netburn.  That took place on

9    May 15th.

10          I have reviewed the presentence report prepared by the

11   probation department.  That report is dated August 3rd.  It's

12   a 40-page report that includes a sentencing recommendation.

13          I've reviewed Mr. DeMarco's and Mr. Faga's sentencing

14   submission.  It's a very thorough submission.  Let me just tell

15   you the exact number of pages, for the record.  It is 13 pages,

16   single spaced, with attachments that go for another 50 pages or

17   so, including dozens and dozens of letters, as I mentioned, and

18   some other things, including doctor's reports and things.  So

19   I've reviewed all of that.

20          I've also reviewed the supplement dated August 28th

21   prepared by Mr. DeMarco.  That's a one-page, one-sentence

22   letter that also then attaches several additional letters from

23   friends and family members -- friends, I think, primarily.

24          I then have the government's sentencing submission

25   dated August 31st.  That submission is 14 pages, single

H971pars

1    spaced.

2              I then received just yesterday a letter.  I always ask

3    that the letters from friends and family members be sent to the

4    lawyer, to Mr. DeMarco or Mr. Faga to be then included in their

5    submission.  That way I don't miss anything.  I got a letter

6    yesterday addressed to chambers.  So it's a letter from Anthony

7    Cerasuolo, I'm not sure if I'm pronouncing that right.

8    C-E-R-A-S-U-O-L-O.  It's a two-page letter.  Have you had a

9    chance to see that?

10             MR. DeMARCO:  No, your Honor.  May I?

11             THE COURT:  All right.  I'll give it to you just so

12   you can see it, each of you.  It's relatively short.  I was

13   going to docket it yesterday, but I got it late in the day.  I

14   highlighted one portion or so, but it doesn't matter.

15             (Counsel reviewing letter)

16             THE COURT:  And let Mr. Parrello read it as well.

17             (Defendant and counsel reviewing letter)

18             MR. DeMARCO:  Thank you, your Honor.

19             THE COURT:  Okay.  I will docket that later today, but

20   I wanted to make sure you had a chance to see it before we

21   proceed.

22             MR. DeMARCO:  Thank you.

23             THE COURT:  Okay.  In addition to those materials, I

24   also have reviewed the consent preliminary order of forfeiture

25   and money judgment that was executed by the parties I think

H971pars

1   right before the guilty plea, and so that calls for forfeiture

2   in the amount of $63,800.

3        And then I've also reviewed the sentencing materials

4   from the 2001 case involving Mr. Parrello.  That was another

5   45- or 46-defendant case.  Mr. Parrello again was the lead

6   defendant, the first name in the indictment.  In that case, it

7   was a case that resulted in a sentencing by Judge Carter of 88

8   months.  And so I reviewed, among other things, the sentencing

9   transcript from that proceeding, the guilty plea transcript,

10  and other items on the docket related to sentencing.

11       Okay.  So that's what I've reviewed.  Is there

12  anything I've overlooked, anything I've neglected to mention

13  that the parties believe should be before me?  Ms. Lonergan?

14       MS. LONERGAN:  Not from the government, your Honor.

15       THE COURT:  Mr. DeMarco?

16       MR. DeMARCO:  No, your Honor.

17       THE COURT:  Okay.  All right.  Well, let's begin with

18  the presentence report.  Mr. DeMarco, you received a copy of

19  the presentence report and reviewed it with Mr. Parrello?

20       MR. DeMARCO:  Yes.

21       THE COURT:  Do you have any objections to what's in

22  the presentence report?

23       MR. DeMARCO:  No, your Honor.

24       THE COURT:  Okay.  Ms. Lonergan, you've also received

25  a copy of the presentence report?

H971pars

|     |                                                                        |
|-----|------------------------------------------------------------------------|
| 1   | MS. LONERGAN:  Yes, your Honor.                                         |
| 2   | THE COURT:  Do you have any objections to what's in                    |
| 3   | the presentence report?                                                |
| 4   | MS. LONERGAN:  No, your Honor.                                          |
| 5   | THE COURT:  Okay.  So Mr. Parrello, let me remind you                  |
| 6   | of what Judge Netburn told you when you pled guilty.  There are        |
| 7   | a number of factors that a judge like me has to consider when         |
| 8   | deciding what sentence to impose in a case, and one of those          |
| 9   | factors is something called the United States Sentencing              |
| 10  | Guidelines, and you're familiar with the guidelines, are you,         |
| 11  | Mr. Parrello?                                                          |
| 12  | THE DEFENDANT:  Yes, your Honor.                                       |
| 13  | THE COURT:  Yeah.  So for those of you who may not be,                 |
| 14  | the Sentencing Guidelines are a big book, and this is a book          |
| 15  | that's put out by a commission.  It's called the United States        |
| 16  | Sentencing Commission.  It's a commission that consists of some       |
| 17  | judges and some lawyers and some experts in the field of              |
| 18  | criminal law.  And the way it works is that every crime or type       |
| 19  | of crime is covered by a chapter in this book.  And so it's a         |
| 20  | long book.  It's like 5 or 600 pages long.  But for every crime       |
| 21  | there's a chapter, and the judge in a particular case is              |
| 22  | instructed to go to that chapter, and once in that chapter, the       |
| 23  | judge is directed to make certain findings, findings of fact.         |
| 24  | And those findings will then be calculated in terms of a              |
| 25  | number.  You'll get a numerical number, and the judge then adds       |

H971pars

1    points and in some cases subtracts points, and ultimately the

2    judge comes up with a number that is called the offense level.

3    The judge then goes to another chapter in this book, and that's

4    the chapter that relates to criminal history.  And not

5    surprisingly, people who have been convicted of crimes and who

6    have served lengthy jail terms, they typically will be treated

7    more harshly than people who have no prior convictions.  And so

8    the judge goes to the chapter relating to criminal history and

9    the judge makes findings as to whether there were prior

10    convictions and, if so, when they were, and for how long the

11    sentence was, if it involved a term of incarceration.  And

12    based on the answers to those questions, the judge assigns

13    points and comes up with another number.  That number is

14    referred to as the criminal history category.  There are six

15    criminal history categories.  Category I is the lowest and

16    least serious; category VI is the highest and the most serious.

17    And then with those two numbers that I talked about, the

18    offense level on the one hand and the criminal history category

19    on the other, the judge goes to the back of this book, where

20    there's a table or a grid, and I don't know if you can see it,

21    Mr. Parrello, but I'm sure you've gone over it with Mr. DeMarco

22    and Mr. Faga, but it's a chart, basically.  And there's a

23    column here on the far left that's the offense level column.

24    It's numbered 1 through 43.  And the judge goes down that

25    column until he or she gets to the number that the judge found

1    to be the offense level in that case.  The judge then goes

2    across these other columns from left to right, each of which

3    reflects a criminal history category, and the judge keeps going

4    until he or she gets to the criminal history category that the

5    judge found to be appropriate.  And where the judge's finger

6    finally stops, well, that is the range which is set forth in

7    terms of months that the commission, the folks who prepared

8    this book, believe would be appropriate for that offense level

9    and that criminal history category.

10        So that's how this book works.  And we're going to

11   spend a few minutes talking about it.  This book is only one

12   factor that applies here.  I don't have to follow this book.

13   It's not mandatory.  I'm free to sentence above or below the

14   range in this book.  I do, however, have to go through the

15   process of making my findings and I have to announce what the

16   range is before I move to the other factors that are also

17   relevant to sentencing.  So it can seem a little technical.  I

18   apologize for that.  But it's important.  This book is very

19   important, at least as a starting point for determining what

20   the sentence will be.

21        So in this case the probation department has set forth

22   its view as to what the guidelines are in this case.  So

23   Mr. Parrello, you pled guilty to three different counts in the

24   indictment, and each of those counts is treated as a separate

25   group, and so I do a separate guidelines analysis for each and

H971pars

1    then I have to go to another part of the guidelines where I

2    group them, and I add more points if the groups are sort of

3    closely together in terms of what the offense level is.  So

4    we're going to spend a few minutes on it.  I don't think there

5    are any objections.  It doesn't sound like there are any

6    objections.  But if there are questions that you have, you'll

7    let me know, okay?

8                 THE DEFENDANT:  Yes.

9                 THE COURT:  All right.  So the first group is a

10   conspiracy to commit extortion.  That's in Count One.  The base

11   offense level under the guidelines is level 18.  There's then a

12   two-level increase because the offense involved an express or

13   implied threat of death, bodily injury, or kidnapping, and so

14   that's a two-level increase pursuant to 2B3.2(b)(1).  There's

15   then an additional one-level increase because the loss, or the

16   amount of money that was demanded, was more than $20,000 but

17   less than $95,000 and so that's a one-level increase under

18   Section 2B3.2(b)(2) and 2B3.1(b)(7)(B).

19                According to probation, there's then a three-level

20   enhancement because Mr. Parrello was a manager or supervisor

21   but not an organizer or leader and the criminal activity

22   involved five or more participants or was otherwise extensive.

23   So that's a three-level increase under Sentencing Guidelines

24   Section 3B1.1(b).  And that's where I have a question, because

25   the government's letter and the conduct described in the

H971pars

1    presence report suggest that Mr. Parrello is a leader.  I

2    mean, a manager or supervisor would seem to understate his

3    role.  In fact, the government uses the word "leadership"

4    throughout its letter.  I can quote it.  I think I will.  The

5    defendant's leadership role is referenced on page 11.  "The

6    crimes to which Mr. Parrello pled were both serious and

7    violent.  While he didn't commit or directly threaten any

8    violence, he directed others to do so on his behalf.  His

9    instructions were explicit.  Mr. Parrello repeatedly made clear

10   that his messengers were to communicate that the recipients

11   ignored his messages at their peril.  He was therefore able to

12   terrorize debtors by proxy."  And basically it describes him as

13   sort of returning to the same activity that he was convicted of

14   before when he was an acting capo of the Parrello Crew.  So I'm

15   not sure why a three-level enhancement is appropriate instead

16   of a four-level enhancement, and maybe somebody can help me

17   with that.  So again, I'm not bound by the government's and

18   Mr. Parrello's plea agreement.  They agreed that three levels

19   was appropriate, but I just don't see it, given what's been

20   alleged here, and given how extensive the criminal activity

21   was.  Certainly more than five people.

22          So anybody want to take a crack at that one?

23          MS. LONERGAN:  Your Honor, just focusing on your last

24   comment, my understanding is that we look at the extensiveness

25   of the criminal activity or the number of people involved not

H971pars

 1    with the overall conspiracy which was initially charged in the

 2    indictment but rather for each extortion, and in fact, even had

 3    the defendant here been convicted of a racketeering conspiracy,

 4    which he's not, but even in that framework, leadership points

 5    are not -- we'd then be looking at the racketeering conspiracy,

 6    but here, we're looking at the extortions, and so the

 7    government's position is that with respect to the first

 8    extortion, the extortion of Victim 1 --

 9              THE COURT:  Right.

10              MS. LONERGAN:  -- that that crime in and of itself did

11    not involve five or more participants or was otherwise

12    extensive, and that is why the government assigned three

13    leadership points rather than four.

14              THE COURT:  Wait a minute.  No, then it should be two.

15    If that's what you're saying, that makes no sense at all.

16    Respectfully.  If it's not five or more people, then whether

17    he's an organizer, leader, manager, or supervisor, he would get

18    two levels.

19              MS. LONERGAN:  Oh, under -- yes, yes, your Honor.  One

20    moment, your Honor.

21              (Government counsel conferring)

22              THE COURT:  The presentence report talks about

23    Mr. Parrello, Mr. Torres, Mr. Zinzi and others.  It lists the

24    others, including the CW.  It doesn't give the names of the

25    others but it does list them, CC3, CC2 --

1            MS. LONERGAN:  Your Honor, let me retract what I

2     previously said.  So in the sentencing submission, I agree the

3     government used the word "leadership."  I think we used that

4     word not as a term of art the way it is used in the Sentencing

5     Guidelines but rather to mean someone who has some sort of role

6     that is higher, perhaps, in a hierarchy than others.  And we

7     believe that that term, "leadership," encompasses manager,

8     supervisor, organizer, or leader.

9            THE COURT:  All right.  Well, this is what leadership

10     and organizational role typically contemplates, according to

11     the guidelines.  "Although the names or nomenclatures such as

12     'kingpin' or 'boss' are not controlling, factors that should be

13     considered by the court include:

14            The exercise of decision-making authority.  I think we

15     have that.

16            The nature of participation in the commission of the

17     offense.  I think you made it clear that nobody could collect

18     anything without Mr. Parrello's say-so.

19            The recruitment of accomplices.  I mean, he certainly

20     authorized people to do things in the collection of the debt.

21            The claimed right to a larger share of the fruits of

22     the crime.  That's certainly the case here, I think, right?

23     You said he got 28,000 out of the 30 that was collected.

24            The degree of participation in planning or organizing

25     the offense.  You indicated he's sort of doing it by proxy, but

H971pars

1    certainly he is, it seems to me, the leader.

2          The nature and scope of the illegal activity and the

3    degree of control and authority exercised over others.

4          So which of those doesn't apply here?

5          MS. LONERGAN:  Your Honor, I think the reason that we

6    believed that the three-level enhancement is appropriate more

7    than the four-level enhancement is because the way that we

8    understand that these crimes took place primarily involved

9    other individuals, other members of the conspiracy really

10   coming up with a plan --

11         THE COURT:  Yes.

12         MS. LONERGAN:  -- like a desire to extort somebody.

13         THE COURT:  Sure.  That's the way it always works,

14   right?

15         MS. LONERGAN:  And then going to Mr. Parrello

16   basically for his okay.

17         THE COURT:  Yes.

18         MS. LONERGAN:  But he was not involved really in the

19   details.  I think even with respect to recruiting accomplices,

20   sometimes he might say take this person with you but --

21         THE COURT:  Well, he did say that.

22         MS. LONERGAN:  Yes, your Honor, but many times the

23   participants of the plan were brought to him.  For example --

24         THE COURT:  And that you think makes a person not an

25   organizer or leader but a manager or a supervisor?

H971pars

1          MS. LONERGAN:  Your Honor --

2          THE COURT:  So who were the leaders, if not

3  Mr. Parrello, for this extortion?

4          MS. LONERGAN:  Your Honor, it's not necessary that

5  every crime have someone in every level of the hierarchy.

6          THE COURT:  But how is it possible to have managers

7  and supervisors without leaders?

8          MS. LONERGAN:  Well, your Honor, I would submit here

9  that yes, Mr. Parrello, I would say, by dint of his role, I

10  would put him most likely at the top of the hierarchy, but I

11  don't think that it's necessary that every hierarchy have a

12  leader, a manager, and in fact, as the Court is aware, there

13  are many crimes, many conspiracies, large groups of people, in

14  which no one is assigned a leadership role even though

15  different participants exercised different roles.

16          THE COURT:  Okay.  But this is what the presentence

17  report, to which no one has objected, says with respect to

18  extortion 1.  "Parrello ordered that Torres threaten Victim 1

19  on at least two different occasions.  Parrello collected

20  $30,000 from Victim 1 using the threat of death or physical

21  injury and kept approximately $28,000 for himself.  And then

22  the CW ultimately paid the $30,000 owed to Capolongo."  So that

23  seems to tick off most of the things that I described from the

24  commentary on role in the offense.

25          MS. LONERGAN:  Your Honor, I think that these

H971pars

1    distinctions are in certain ways somewhat subjective, and so

2    the government, in negotiating a plea agreement, took a

3    position thinking about litigation risk, thinking about what

4    would be readily proven at a *Fatico*, and agreed with defense

5    counsel that the manager, supervisor enhancement was

6    appropriate based on the government's assessment of what proof

7    would look like with respect to a *Fatico* and contemplating

8    litigation risk.  And for those reasons the government stands

9    by its agreement with defense counsel.  Of course recognizing

10   that the Court or probation is free to apply whatever

11   enhancement the Court thinks is appropriate.  But that was also

12   part of the consideration that went into the government's plea

13   agreement with defense counsel.

14           THE COURT:  Okay.  Mr. DeMarco?

15           MR. DeMARCO:  Judge, I join in Ms. Lonergan's

16   application and just echo the arguments she made to this Court

17   and believe that the three-point enhancement is the proper

18   enhancement in this case.

19           THE COURT:  Okay.  Ultimately that one is my call, and

20   I just don't see it.  I mean, I can see why it might be

21   attractive to sort of trade points as you try to get to a plea,

22   but the bottom line is, everybody knows -- and Mr. Parrello

23   certainly was told this at the time he pled guilty -- that it

24   would be for the Court to determine how the guidelines really

25   apply, and my job is to just play it straight, and it seems to

1   me that there's no justification for calling this manager or

2   supervisor instead of organizer or leader.  I just think that

3   any definition of that term that's consistent with what's in

4   the commentary compels a four-level increase.  So I'm going to

5   make it a four-level increase.  So that results then in an

6   adjusted offense level of 25.

7           Count Two, which is another conspiracy to commit

8   extortion, also begins with a base offense level of 18, has a

9   two-level increase because of the express or implied threat of

10  death, bodily injury, or kidnapping.  There's a one-level

11  increase because of the amount that was demanded, or the loss

12  that was involved.  And then the role in the offense for this

13  group is, in the probation report, listed as three.  I think in

14  this one the parties have said no enhancement at all, I think,

15  is that right, in the plea agreement?

16          MS. LONERGAN:  That's correct, your Honor.

17          THE COURT:  Okay.  So explain why that is.

18          MS. LONERGAN:  Your Honor, this one -- I'm sorry.

19  When I made the argument I had with respect to the first

20  extortion, so we believe that no leadership enhancement is

21  appropriate here because the people, the participants had more

22  of an equal role in this.  Mr. Parrello is, I think by dint of

23  who he is, sometimes exercises a little bit more authority, but

24  here we thought that it wasn't as direct as it was in the other

25  extortions, and so we believed --

H971pars

1       THE COURT:  But can I interrupt you.  I'm sorry.

2       MS. LONERGAN:  Yes, your Honor.

3       THE COURT:  It seems to me that what you have said is

4  that nobody could do anything, nobody could go collect or shake

5  down or threaten somebody without Mr. Parrello's permission.

6  Isn't that what you've said?  Or am I wrong about that?

7       MS. LONERGAN:  Your Honor, I think, with respect to

8  each of these extortions, with respect to certain of the

9  extortions, yes, Mr. Parrello provided authorization for the

10  others to act on his behalf.

11       THE COURT:  But Mr. Parrello was the one intimately

12  involved in deciding what the terms of the collection were

13  going to be, according to what's in the presentence report,

14  right?  In fact, he rejected offers made by other individuals

15  on behalf of the debtor, right?

16       MS. LONERGAN:  That's correct, your Honor.

17       THE COURT:  And it's Mr. Parrello who is telling

18  Mr. Torres and Mr. Zinzi what to do and how to go about doing

19  it, according to what's in this report.  He instructed them to

20  go knock on his "expletive" door, tell him I want my

21  "expletive" money, cut his "expletive" tire, and that way he

22  can't get away from you.  So basically tells them to go slash

23  his tires and get the money.  He then is directly negotiating

24  with people on behalf of the debtor, is setting the terms, and

25  ultimately denying the terms of offers made, and then they come

H971pars

```
 1    up with sort of a payment plan that Mr. Parrello has to bless.
 2    So it's not clear to me why they're all equals.  It seems to me
 3    that Mr. Parrello is the person who is in authority and he will
 4    decide whether and how the debt is collected and on what terms.
 5    And he will authorize the use of force, that nobody can do
 6    without his permission, according to what I'm reading here.
 7    Maybe it's wrong.  But that's what's in the report, that no one
 8    objected to.
 9              MS. LONERGAN:  One moment, your Honor.
10              (Counsel conferring)
11              MS. LONERGAN:  Your Honor --
12              THE COURT:  Yes.
13              MS. LONERGAN:  I'm sorry.  I'm just noticing this now,
14    and maybe this is going to clear up some of the confusion.  So
15    when you look on page 3 of the PSR, paragraphs --
16              THE COURT:  Page 3?
17              MS. LONERGAN:  Yes.  Paragraphs 1, 2, and 3 describe
18    the three counts and the three extortions.
19              THE COURT:  Right.
20              MS. LONERGAN:  And it says Victim 1, Victim 2, Victim
21    3.  And what I think happened -- and this may be on us, and my
22    apologies for not catching this sooner -- is that the
23    description later that what happened is that Victim 2 and
24    Victim 3 got swapped, so Count Two, which is the count for
25    which the government applied no leadership points, should
```

1    actually be the description of the conspiracy to extort Victim

2    3.

3            THE COURT:  Oh.

4            MS. LONERGAN:  That is the one in which it is

5    primarily a conspiracy being directed -- or not being directed,

6    but it is really at Mr. Maiorino's behest that this is

7    happening and Mr. Parrello plays much less of a role in that

8    extortion.  And that is why we thought that no leadership

9    points were appropriate for that, and that I think is where the

10   confusion has come from, and we should have caught this error

11   earlier.

12           THE COURT:  Okay.  All right.  But even assuming

13   that -- so let's talk about that one then.

14           MS. LONERGAN:  Sure, your Honor.

15           THE COURT:  Because paragraph 53 says that

16   co-conspirator 1 explained that Parrello "made a decision, 'I

17   would very, very, very much advise you not to go against it.'

18   Victim 3 responded, 'I got it.'  That's it.  That's like the

19   judge putting the [expletive] guilty 20 years, have a nice

20   life."  In other words, that Mr. Parrello is judge and jury

21   when it comes to this kind of thing.  So that would suggest to

22   me, again, that he is the guy in charge and nobody can collect,

23   threaten, or keep money without his permission.  Am I wrong

24   about that?

25           MS. LONERGAN:  Well, your Honor, I think what's going

H971pars

1    on here --

2           THE COURT:  Ultimately in fact Mr. Parrello pulled the

3    plug on this because of what appears to have been some

4    confusion about the identity of Patty Boy.

5           MS. LONERGAN:  Yeah, I don't think he pulls the plug

6    on the conspiracy.  What he --

7           THE COURT:  Well, the conspiracy has already taken

8    place.

9           MS. LONERGAN:  Yes.

10          THE COURT:  But he pulls the plug on the collection,

11   right?

12          MS. LONERGAN:  Well, on certain individuals being

13   involved in the collection.  So it's the cooperating witness

14   and a co-conspirator who's now deceased who are collecting this

15   debt on behalf -- or attempting to collect this debt on behalf

16   of Pasquale Maiorino.

17          THE COURT:  Well, but he basically took certain people

18   off of the collection -- namely, the CW and CC1.

19          MS. LONERGAN:  Yes, your Honor.

20          THE COURT:  He said they couldn't be involved in

21   collecting the debt anymore.  He then realizes that Patty Boy

22   is Maiorino and not somebody else.  And then the last thing in

23   the presentence report just says basically that somebody paid

24   this debt of $30,000.

25          MS. LONERGAN:  Yes, your Honor.

H971pars

```
 1          THE COURT:  Not telling me where it went and what
 2   Mr. Parrello's role was in that.
 3          MS. LONERGAN:  Mr. Parrello basically says that his
 4   people are no longer going to be allowed to participate or help
 5   out in the collection of this debt.  It really is a debt.  It's
 6   Mr. Maiorino's debt.  And these three individuals come to
 7   Mr. Parrello and basically say, we would like to do this on
 8   behalf of Patty Boy.  Mr. Parrello misunderstands who Patty Boy
 9   is, says go ahead.  They then work primarily with Mr. Maiorino
10   in attempting to collect the debt.  They use Mr. Parrello's
11   name, but really the debt is Mr. Maiorino, the debt owed to
12   Mr. Maiorino.  And then at some point when Mr. Parrello
13   realizes that he was confused about who Patty Boy is, he did
14   not think it was Mr. Maiorino, he believed it was someone else,
15   he asks the cooperating witness and CC1 to stop being involved
16   in the debt collection.
17          THE COURT:  Yes.  Okay.  But it doesn't seem to me to
18   diminish Mr. Parrello's role.
19          MS. LONERGAN:  Your Honor, while we certainly hear the
20   Court's argument, again, for many of the reasons that we
21   discussed with respect to the prior extortion, in thinking
22   about the facts of this extortion conspiracy as we understand
23   them and what would be readily proveable, we, the government,
24   in compiling the plea agreement -- and including the fact that
25   Mr. Parrello did not benefit financially from this extortion
```

H971pars

1    conspiracy -- believed that the appropriate enhancement here

2    was no leadership points, and we stick by that, but it is the

3    Court, of course -- as the defendant and everyone is aware, it

4    is ultimately the Court's decision.

5            THE COURT:  Okay.  Mr. Faga, did you want to be heard

6    on this?

7            MR. FAGA:  Your Honor, with respect to the -- I know

8    we've talked back and forth, but with respect to the Maiorino

9    extortion, we respectfully submit that this was basically

10   Maiorino's plan, Maiorino was directing, and that the CW and CC

11   went to Mr. Parrello and said, hey, do you mind if we help

12   somebody else out, and he said, no, go right ahead.

13           THE COURT:  Well, I mean, the report says more than

14   that.  So --

15           MR. FAGA:  I think other people attribute words to

16   him, but I don't believe that any of that came out of

17   Mr. Parrello's mouth.

18           THE COURT:  Well, I mean, we're talking now about

19   what's in the presentence report as Victim 3, right?  That's

20   what we're talking about?

21           MS. LONERGAN:  That's correct, your Honor.

22           THE COURT:  And we have to correct what's in the

23   presentence report to make sure that Victim 3 really pertains

24   to Count Two.  But, I mean, it is represented, and it's

25   apparently recorded, that Parrello made the decision about what

H971pars

1    was going to have to be paid and when and how.  So it's then

2    when Parrello sort of gets full disclosure about what's going

3    on, including the fact that Victim 3 -- well, basically

4    paragraph 59, it says Mr. Parrello basically said, you guys

5    can't be involved in this collection anymore, and he shuts it

6    down, which is something only a leader, it would seem to me,

7    can do.  Seems to me it's still five people because Spirito

8    enters the conspiracy at that point, but I think it's the same

9    conspiracy.  So it seems to me that that is a leadership role.

10   So I'm going to again assign four instead of three points,

11   which then puts Group 2, which really pertains to Count

12   Three -- so it's a little confusing because of what

13   Ms. Lonergan just told me, but anyway, the conspiracy relating

14   to Victim 3, 25 is the adjusted offense level.  And then there

15   is Group 3.

16          MS. LONERGAN:  Your Honor, may I just interrupt for

17   one moment with respect to that.

18          THE COURT:  Sure.

19          MS. LONERGAN:  I just, again, respectfully -- of

20   course it's the Court's decision, and I'm not a mathematician,

21   but I think that there are not five participants in that one.

22   I don't think we count the --

23          THE COURT:  Mr. Parrello, Mr. Maiorino, CC1, and CW?

24          MS. LONERGAN:  I don't think we count the cooperator.

25          THE COURT:  Was he a cooperator at the time?

H971pars

1              MS. LONERGAN:  He was.

2              THE COURT:  Oh.

3              MS. LONERGAN:  And then I think it's also Mr. Spirito,

4       but I think that's only four.

5              THE COURT:  All right.  But then that would be a

6       two-level I guess enhancement, if it's not more than five

7       people.

8              MS. LONERGAN:  That's correct, your Honor.

9              THE COURT:  Okay.  So we're then talking about --

10             MS. LONERGAN:  It should be Count Two.

11             THE COURT:  Which in the presentence report is

12      Group 3?

13             MR. DeMARCO:  Right.

14             MS. LONERGAN:  Yes, your Honor.

15             THE COURT:  All right.  And then so this is the one

16      that had the dangerous weapon?

17             MS. LONERGAN:  No, your Honor.

18             THE COURT:  So Group 2 is actually Count Three and

19      Victim 3.  That then should be a two-level enhancement for role

20      if there's less than five.

21             MS. LONERGAN:  The Count Two is the Victim 3.

22             THE COURT:  So Count/Group 2 is Victim 3.  All right.

23             And then the other question I had is:  Is the loss

24      more than 20,000?  In the presentence report it talks about

25      16,000.  And so now it may be with interest or the vig,

H971pars

whatever you want to call it, it's above that.  But in the

presentence report, there is not a lot of information beyond

that.  So Victim 3.  Actually, no, Victim 3 is $40,000.  So

never mind.  The amount is still then more than 20, less than

95.

MS. LONERGAN:  Yes, your Honor.  That's correct.

THE COURT:  Okay.  So then we're at 23.

And then there's Group 3, which is Victim 2.  So

Victim 2, according to the parties, is Base Offense Level of 18

plus two for making threats of death, bodily injury, or

kidnapping.  This is a three-level enhancement because of a

dangerous weapon.  Dangerous weapon is what?

MS. LONERGAN:  An ice pick, your Honor.

THE COURT:  An ice pick.  Okay.  And then here, again,

there's an agreement that a leadership role or an enhancement

is appropriate for role.  The parties have agreed that it's

manager or supervisor.  It seems to me that it's

leader/organizer.  Is there any argument that this is less than

five?

MS. LONERGAN:  No, your Honor.

THE COURT:  All right.  So it seems to me that based

on what's in the presentence report, I'm again prepared to

conclude that it's a leadership role, which is a four-level

enhancement.

I did have a question, though, here, about the amount,

H971pars

1   but, actually, there's no enhancement amount here.  So 18 plus

2   2 plus 3 plus 4 is 27.  That means the levels are 25, 23, and

3   27.  Let me just see if that affects the grouping analysis

4   since we now have a range of four levels between the highest

5   and lowest.

6           I apologize to you folks.  This is really sort of like

7   accounting, and it is dry and on some level very dull.  But it

8   is important ultimately in getting to the range, which is the

9   starting point, so thanks for your patience.

10          So with respect to grouping, so the grouping analysis

11  should be affected or not affected by this?

12          MS. LONERGAN:  Your Honor, I think that the highest

13  level is 27.

14          THE COURT:  Yes.

15          MS. LONERGAN:  Count One, which is a level 25, that's

16  going to be one additional unit.

17          THE COURT:  Yes.

18          MS. LONERGAN:  And Count Two, which is 23 --

19          THE COURT:  Yes.

20          MS. LONERGAN:  -- is also one additional unit.  Under

21  3D1.4(a), it says, "Count as one unit the group with the

22  highest offense level.  Count as one additional unit for each

23  group that is equally serious or from one to four levels less

24  serious."

25          THE COURT:  Okay.  So --

1          MS. LONERGAN:  So it's three units.

2          THE COURT:  So it doesn't affect the grouping

3    analysis, which adds three more units to the highest level.

4          MS. LONERGAN:  Correct, your Honor.

5          THE COURT:  So that's then 27 plus 3, which is 30.

6          All right.  There's then three levels off for

7    acceptance of responsibility, which puts us at 27.

8          And then we'll talk about the reduction, the one-level

9    extra reduction, which the parties agreed to as sort of a

10   logjam or a concession in the event that 40 or 38 of the

11   defendants pled guilty by a set time.  The criminal history, I

12   don't think there's any dispute.  There's a 1961 conviction

13   that led to a year imprisonment, but that doesn't count, given

14   the age of that conviction.  There is, however, the 2003

15   conviction which resulted in a sentence of 88 months for

16   racketeering.  That results in three criminal history points.

17   It sounds like the earliest alleged conduct in this indictment

18   was after Mr. Parrello was off supervised release, so I don't

19   think there's any further enhancement.  So that's criminal

20   history category II.

21         So offense level 27, criminal history category II, is

22   78 to 97 months.

23         If I were to accept the one-level reduction as part of

24   the global plea agreement, so that would bring it down to level

25   26, which is 70 to 87 months.

H971pars

1             So that's my math.  Does anybody disagree with my

2      math?  I know there were disagreements as to whether the extra

3      role point is appropriate, but anybody think I got the math

4      wrong?  Mr. DeMarco?

5             MR. DeMARCO:  No, you got the math right, your Honor.

6             THE COURT:  Okay.  And Ms. Lonergan?

7             MS. LONERGAN:  The math is correct, your Honor.

8             THE COURT:  So 70 to 87 months.

9             Well, that took longer than I thought, but it is

10     important.  According to this book, at least as I interpret

11     this book, Mr. Parrello, the guidelines range here is 70 to 87

12     months.  However, there are other factors that are just as

13     important as this book that judges have to consider in

14     fashioning a sentence.  Judge Netburn told you what those were,

15     but I want to remind you and let everybody know, because it's

16     obviously going to affect a lot of people.  There are a bunch

17     of other factors that Congress has said judges have to

18     consider, in addition to the book.  Those factors include,

19     first of all, your own personal history, so the facts and

20     circumstances of your life, from your birth right up until now.

21     I have to consider the whole person.  Many of the letters that

22     I received urged me to consider the whole person, look at this

23     person's entire life, and that's exactly what I have to do,

24     whether I wanted to or not.  Of course I want to, but that's

25     what I'm required to do, look at the whole person.  I have to

H971pars

1  make sure that the sentence I impose in this case is tailored

2  to you as an individual.  And you're unique.  You're different

3  than anybody else I've ever met or will ever sentence, and so I

4  have to consider your unique experience in fashioning a

5  sentence.  So that's one thing.

6        Another factor that I have to consider involves the

7  facts and circumstances of these crimes.  These are very

8  serious crimes.  And I have to consider what exactly went on

9  here, not just what these crimes are called, but what they

10 entailed, what your role was, what the role of other people

11 was, what harms were caused, what injuries, what impact this

12 had on other people and communities.  I have to make sure that

13 I tailor this sentence not just to you as a person based on

14 your whole experience but also to the particular crime.  Now in

15 some ways the guidelines sort of do a decent job of that, but I

16 have to peel behind the guidelines and look very realistically

17 and in detail at these crimes to make sure that the sentence I

18 impose reflects the seriousness of these crimes and that the

19 sentence I impose promotes respect for the law, and that it

20 provides a just punishment for the crime.  So that's another

21 factor.

22        Another factor that I have to consider is the need to

23 deter or discourage you and others from committing crimes like

24 this in the future.  It's the hope that by imposing a sentence

25 on you today, I will send a message to you and to other people

1    who might learn about this sentence in the future, and

2    hopefully the message will be received and internalized and it

3    will affect future behavior.  The message will be that, hey,

4    we're not fooling around here.  This is serious.  And the

5    penalties are serious.  And hopefully people say, wow, these

6    penalties are serious and it is just not worth it.  The cost in

7    time and years and separation from loved ones far exceeds the

8    benefits of dollars and cents that comes from this kind of

9    criminal activity.  Now I don't have a crystal ball.  I can't

10   know for certain whether you or other people will get the

11   message and whether your future conduct will be affected by the

12   sentence that I impose, or whether their future conduct will be

13   affected.  But there's something to this, I think most people

14   acknowledge.  I think criminal justice systems from the

15   beginning of mankind have sort of recognized that this is part

16   of what goes into sentencing.  And so as a judge, I'm required

17   to think about that and to use my best judgment as to what the

18   deterrent effect would be of the sentence that I impose.  So

19   that's another factor.

20          Another factor requires me to consider your own

21   personal needs while you're in custody.  So, I mean, you're a

22   healthy guy, but you've got some health issues.  No question

23   about it.  You're older than most of the defendants that I

24   sentence.  It tends to be a young man's game, and most of the

25   people I sentence are in their 30s or 40s or younger, and they

don't typically have a lot of health issues.  They might have
other issues, mental health issues or substance abuse treatment
needs which have to be addressed.  Some of the very young ones
need job training or educational opportunities, which doesn't
affect you as much.  But whatever the needs of an individual
defendant, I have to make sure that the sentence I impose, if
it involves incarceration, is going to address their needs,
whatever they are.  So that's another factor.

            And then finally, the last factor that I have to
consider in addition to all the others is sometimes referred to
as the need to avoid unwarranted sentencing disparities between
similarly situated people.  And that's kind of a mouthful.  And
what it means, I think, is that before imposing a sentence in a
particular case, I have to take a step back and make sure that
the sentence I'm imposing is consistent with or at least in
line with other sentences imposed in other cases involving
similar conduct and similar defendants.  No two cases are
exactly alike, no two defendants are exactly alike.  But where
there are similarities, it's important that the sentences be
similar, because if the sentences are all over the place, if
some people get, you know, really harsh, lengthy sentences,
others get almost nothing simply because there were different
judges involved or different lawyers involved or it was
different parts of the country, well, that would probably
encourage disrespect for the law, and one of the goals of

1    sentencing is to promote respect for the law and for the legal

2    process.  So that's another factor I have to consider, the need

3    for some kind of consistency.

4            Now my job is to balance all of those things and to

5    come up with a sentence that is appropriate in light of all of

6    them.  And sometimes that's tricky.  Sometimes some of these

7    factors that I've described argue for a really harsh sentence,

8    while others argue for a lenient sentence, and so the balancing

9    is the part where judgment is required.  And it's often more of

10   an art than a science.  It's something I certainly take

11   seriously.  Every judge I know takes it seriously.  I think

12   about it.  I've been thinking about you a lot in the last

13   couple of weeks as we've been getting ready for this day.  I've

14   been thinking about your family and thinking about the people

15   who wrote, thinking about the impact this sentence will have on

16   them, including your grandchildren, who probably don't really

17   understand what's going on, other than that they know that

18   they're hurting and they're suffering as a result of the

19   separation.  That is part of this process too.  And I'll say up

20   front, I wish that weren't the case.  I wish it weren't the

21   case that innocent people, spouses or children or

22   grandchildren, weren't also affected by a sentence.  But the

23   nature of being human is that we're connected, and often

24   punishing a person who's committed a crime means that there is

25   an impact on the people closest to them, even though they're

H971pars

innocent.

So anyway, we're going to talk about these different factors.  Your lawyers have done a very good job of writing a very thorough submission, and I commend them.  I know Mr. DeMarco and Mr. Faga a long time.  They're really conscientious, smart lawyers, and I thought that their submissions that they made on your behalf was very well done, very thorough, and very helpful to me.  And the letters and things that I got from other people give me insights that I wouldn't otherwise have, so I'm grateful for that.

But I'm going to give the lawyers an opportunity to expand on some of the things they talked about and to make new arguments if they think appropriate.  I'll then hear from the government.  I'll give them a chance to respond perhaps to some of the arguments made by your lawyers, I'll give them a chance to respond to some of my comments so far.  I'll then let Mr. DeMarco or Mr. Faga respond, if they wish, to anything that the government has argued or anything that I may have said. I'm not looking to shut this down.  We're in no hurry today.  I apologize for that in some ways, but this is a really important date for you and for your family and for others, so we're going to take our time.  It's important that we do this right.  I only get to do this once.  And so it's important that we do this carefully, dispassionately, respectfully, and diligently. So that's what we're going to do, okay?

H971pars

1    So do you have any questions so far, Mr. Parrello?

2    THE DEFENDANT:  No.  I'm following you very well.

3    THE COURT:  You're able to hear me okay?

4    THE DEFENDANT:  Yes.

5    THE COURT:  Good.

6    All right.  So Mr. DeMarco, anything you'd like to say

7    beyond what's in your submission?

8    MR. DeMARCO:  Yes.  May I use the podium?

9    THE COURT:  Yes.  Let's everybody use the lectern I

10   think with the microphone pulled close, just because I want to

11   make sure everybody can hear what's going on.

12   MR. DeMARCO:  Thank you, Judge.

13   THE COURT:  Okay.

14   MR. DeMARCO:  Your Honor, I'm not going to take that

15   long.  I'll take just a little bit of time to emphasize what I

16   think needs to be emphasized about Mr. Parrello.

17   Now having appeared before your Honor on several

18   occasions, I know one thing for certain.  I know for certain

19   that your Honor has thoroughly read the PSR, thoroughly and

20   exhaustively read our submissions including each and every

21   letter that we've submitted on Mr. Parrello's behalf.

22   THE COURT:  Every one.

23   MR. DeMARCO:  We know that, your Honor.

24   THE COURT:  Yes.  More than once.

25   MR. DeMARCO:  I'm certain of that.  If nothing else,

H971pars

1    I'm certain that your Honor has exhaustively read our

2    submissions.  But there's still several points I'd like to

3    emphasize for the Court.

4                THE COURT:  Sure.

5                MR. DeMARCO:  The man that you're going to be

6    sentencing today is 73 years old.  He has total hearing loss in

7    his left ear and partial hearing loss in his right ear, which

8    is progressively worsening.  He suffers from high blood

9    pressure.  He suffers from high cholesterol.  He has been

10   diagnosed with prediabetes.  I'm not sure what that means, but

11   his doctor included that in the letter to this Court.

12               THE COURT:  I read that, yes.

13               MR. DeMARCO:  He also has some dental issues.  Now

14   about five years ago, he had some implants done on his front

15   teeth.  Caps were implanted in his mouth.  Now since his arrest

16   in this case, since his incarceration, they have loosened.  Now

17   as you can see from the letter from his dentist, Dr. Weiss, and

18   also in our submission, we made note that, if not properly

19   taken care of, infection can set in, and as your Honor is well

20   aware, dental infections can lead to other problems, especially

21   for a 73-year-old man.

22               He has accepted responsibilities for the crimes that

23   he's been charged with.  He pleaded guilty in a timely fashion.

24   And I believe I submitted more than 40 letters by friends and

25   family --

H971pars

1            THE COURT:  Yes, I think so.

2            MR. DeMARCO:  -- on his behalf.

3            THE COURT:  Somebody had said 40.  Maybe you had said

4     40.

5            MR. DeMARCO:  In the initial submission there was 40.

6     I think I gave you maybe three or four more.

7            THE COURT:  It's more than that.  It's dozens.

8            MR. DeMARCO:  Yes.  Now these are letters from friends

9     and family of Mr. Parrello.  And there was a common theme

10    throughout each, or common themes throughout each of the

11    letters that I submitted to your Honor.  Mr. Parrello is a

12    kind, loyal, generous, charitable family man and friend.  He is

13    someone who is religious, who donates his time and his energies

14    to the church in the Belmont section, Our Lady of Mount Carmel.

15           In the courtroom today is his wife, Mrs. Parrello.

16    Mr. and Mrs. Parrello have been married for 52 years, your

17    Honor.  Ms. Parrello submitted a letter on her husband's

18    behalf.

19           THE COURT:  Yes, I read it.

20           MR. DeMARCO:  He is a loving father of Tara Brancato,

21    Dr. Tara Brancato, who is in the audience also today.  She is a

22    professor at Dominican College in Rockland County, New York.

23           THE COURT:  Yes.

24           MR. DeMARCO:  He is the loving grandfather of two

25    7-year-old twins, Pasquale and Liliana, who adore their

H971pars

1     grandfather.  When Mr. Parrello wasn't working at the

2     restaurant, he was taking care often of his two young

3     grandchildren, who adore him.

4              Now, your Honor, from his 7-year-old twin

5     grandchildren to people like 107-year-old Joseph Binder, a

6     World War Two veteran, who is in this courtroom today.

7     Mr. Parrello is loved and adored by all those who know him and

8     have had some contact with him.

9              THE COURT:  Well, first of all, I want to acknowledge

10    Mr. Binder.  So Mr. Binder, thank you for being here, and thank

11    you for your service to our country and for being here for

12    Mr. Parrello.  I'm sure it means a great deal to him.  All

13    right.  So thank you, Mr. Binder.

14             But obviously the victims would not have had the same

15    experience as some of the people who wrote me letters.  Can I

16    interrupt for a second.

17             MR. DeMARCO:  Sure.

18             THE COURT:  There were victims here, and victims have

19    a right to address the Court.  They have a right to be present,

20    or to make a victim statement in writing.  Have any of the

21    victims done that?  Have they been asked if they wanted to do

22    that?

23             MS. LONERGAN:  Yes, your Honor.  They've all been

24    contacted and asked if they wanted to put in submissions, as

25    the government thinks it's important that the victims are heard

H971pars

1    from.  We speak for them, but they also speak for themselves.

2    Unfortunately none of the victims have opted to put in

3    submissions or be here today.

4         THE COURT:  Okay.  All right.  Sorry to interrupt.

5    It's something I wanted to know.  But in any event, there is

6    that sort of obvious --

7         MR. DeMARCO:  Excepting the victims, Mr. Parrello, to

8    his friends and family, is a kind, generous, loving man.  For

9    example, Mr. Binder, who your Honor acknowledged moments ago,

10   as I said previously, he's a World War Two veteran.  He

11   currently resides in a senior center, Providence Rest Nursing

12   Home in the Bronx.  Mr. Parrello regularly sent him meals at

13   the senior center --

14        THE COURT:  I read that.

15        MR. DeMARCO:  -- and also made sure that there was

16   transportation for Mr. Binder to come to the restaurant where

17   Mr. Parrello worked so Mr. Binder can take part in social

18   activities and come to the restaurant and be part of the

19   Parrello family.  Mr. Parrello almost took him in as a father

20   type figure and looked after Mr. Binder.  That's the type of

21   man Mr. Parrello is.

22        Now Mr. Parrello is also a devout Roman Catholic.  Now

23   I say that, your Honor, for the following reason.  Since his

24   arrest, because of the separation orders, as I've set forth or

25   detailed in my submission, Mr. Parrello has been unable to

H971pars

1    attend Catholic services at the MCC and the MDC, which has

2    truly troubled Mr. Parrello, but there is nothing in our power

3    to remove those separation orders.  But I also stated that

4    because Mr. Parrello donated a substantial amount of time and a

5    significant amount of money to his local parish, Our Lady of

6    Mount Carmel.  That's on 187th Street in the vicinity of

7    Arthur Avenue.

8             THE COURT:  I read all that too.  But I guess, again,

9    the sort of obvious question gets raised, well, I don't think

10   Christianity and Roman Catholicism necessarily take an easy

11   view towards extortion and threats of violence in collecting

12   debts, right?

13            MR. DeMARCO:  I'm not saying that it does, your Honor.

14   I'm not saying that the Catholic church condones extortion

15   or --

16            THE COURT:  So it's hard to square some of these

17   things that you're saying about Mr. Parrello, right?  I mean,

18   that's the obvious tension that I see from the submissions and

19   the crimes.

20            MR. DeMARCO:  What I just want to emphasize, your

21   Honor, is that Mr. Parrello takes his religion seriously.  He

22   has donated to different -- significant time and substantial

23   money to the church.  He's helped organize feasts, Feast of

24   St. Anthony and other events that were hosted by the church.  I

25   just ask that your Honor consider that in imposing a sentence.

H971pars

1           Now I think another common theme in the letters

2     submitted were how Mr. Parrello tended to people in times of

3     need or distress.  There are instances where people write how

4     Mr. Parrello has taken people into his home and raised them as

5     one of his children in times when people were in need of a

6     home, a roof, or some sort of parental guidance.  Mr. Parrello

7     was always there when needed for someone in times of distress.

8     He and his wife would take them into the family home and

9     provide for them.  Letters speak about Mr. Parrello paying for

10    cab fares for elderly patrons of the restaurant.  One letter

11    speaks about how Mr. Parrello provided space so that some young

12    kids could practice dancing; how he gave kind and encouraging

13    and uplifting words to people in times of need; how he was

14    instrumental in making sure that the local church had

15    wheelchair access for the disabled; and how he would counsel a

16    young person who he felt was heading in the wrong direction in

17    life.

18          Your Honor, I repeat, Mr. Parrello is 73 years old,

19    and he has significant and serious health issues.  A sentence

20    here within the guideline range could actually result in

21    Mr. Parrello spending the rest of his life in a federal prison,

22    and I ask that your Honor take that into consideration when

23    sentencing Mr. Parrello.

24          Your Honor, you know, in preparing for this

25    sentence -- I'm going a little bit off the cuff here and I

H971pars

1    apologize, your Honor -- I recalled another case I had before

2    your Honor.  It was a trial; it was a debt collection case.

3    I'm sure your Honor recalls it.  And --

4             THE COURT:  On Todd Williams, yes.

5             MR. DeMARCO:  Yes.  And that was an interesting case

6    where we went to trial.  The government's evidence was, I

7    submit, overwhelming.  In that case the defendant took the

8    stand, at trial.  At sentencing, after his conviction, he stood

9    up in this court and showed little, if any, remorse.  His

10   guidelines were in the triple-digit-month range.  He had a

11   significant criminal history.  Although he was charged with

12   wire fraud, it seemed to me that he could have been charged in

13   that case with extortion, given the conduct that was conducted

14   by that debt collection agency.  His guidelines were through

15   the roof, your Honor.  His guidelines were in the 15-year

16   range, if I recall properly.  And your Honor, using 3553(a) and

17   viewing that defendant, who was 51 years old at the time of

18   sentencing, sentenced him to 60 months, and I thought that was

19   an incredibly lenient and fair sentence.  So --

20            THE COURT:  It was a fraud case.  It wasn't an

21   extortion case.  It was a fraud case.

22            MR. DeMARCO:  But you recall the facts of that case,

23   your Honor.

24            THE COURT:  But he hadn't been convicted of

25   racketeering and served seven and a half years previously.

H971pars

1          MR. DeMARCO:  That's correct, but his criminal history

2     was substantial, your Honor.

3          THE COURT:  Yes, yes.

4          MR. DeMARCO:  And his criminal history category was

5     much higher than criminal history II.  And I saw your Honor

6     impose what I believed to be an incredibly fair, lenient

7     sentence.  So I know that your Honor does take this incredibly

8     seriously and considers all of the 3553(a) factors.

9          Now understand this, your Honor -- we are not excusing

10     Mr. Parrello's conduct.  We are not saying that he's innocent.

11     If we were saying that, we wouldn't be here for sentencing

12     after a plea of guilty.  What we are saying is that we have a

13     73-year-old man who has the support of numerous friends and

14     family who have shown up in this courtroom today, many of whom

15     have written letters to this Court providing examples of the

16     good deeds done by Mr. Parrello.

17          I'm going to ask that your Honor consider all of those

18     3553(a) factors, and again, your Honor, I emphasize, I

19     emphasize Mr. Parrello's age and health concerns when doing so,

20     your Honor, and consider giving him a sentence well below the

21     advisory guideline range, as your Honor is empowered to do so.

22          Thank you for giving me this opportunity, your Honor.

23          THE COURT:  That's quite all right.  Thank you,

24     Mr. DeMarco.

25          Ms. Lonergan, do you wish to be heard?

H971pars

1              MS. LONERGAN:  Yes, your Honor.

2              Your Honor, like Mr. DeMarco, I have the utmost

3      confidence that the Court has read everything that's been

4      submitted, and I don't want to belabor the point, but I do

5      think it's important to put in the record a little bit about

6      these crimes, because these crimes are serious and violent, and

7      while it was not Mr. Parrello himself who engaged in any

8      violence, he was well aware of the potential for violence, he

9      was well aware of the fact that others intended to use

10     violence, and he in fact engaged in conversation with his

11     proxies about the kind of words to use and the kind of threats

12     to make to best compel the debtors in this case to pay what was

13     owed.  And I think it's important to understand that this

14     violence was not -- this was not an instance of, say, for

15     example, a violent gang rivalry, and I'm not condoning the

16     violence in any way in those cases, but in certain ways that's

17     a back-and-forth kind of violence in which both sides are, for

18     example, shooting at each other.  There's some element in those

19     cases of retaliating to protect yourself -- not self-defense,

20     but that both sides are engaged in violence, and of course in

21     those cases there are innocent bystanders and civilians who get

22     caught up, but many of the victims in those kinds of cases are

23     themselves perpetrators of violence.  Here, the victims, they

24     were not violent people.  They were not perpetrating violence

25     against the defendant or his co-conspirators.  They did not

H971pars

1    pose any sort of threat to the defendant's own safety.  What

2    they posed a threat to was the defendant's financial

3    well-being.  They owed him and other people money.  And in the

4    face of people who owed him nothing but money, he nevertheless

5    decided that the way to address that was violence.  And I think

6    that's important, because it's a different kind of victim in

7    that situation.

8           Also, these debts were accrued in the course of

9    gambling, which is itself an illegal enterprise.  And the

10   government has already quoted some of the defendant's

11   statements in the sentencing submission, but I think it's

12   important.  Again, I'm going to put some of them in the record,

13   and I'm going to delete the expletives here.  So he, the

14   defendant, says, with respect to one of the victims, "Cut his

15   tire.  That way he'd have to change the tire so then you know

16   you can catch up with him.  Give him a flat.  Take the air out

17   of the tire, whatever you gotta do.  Then catch up with him

18   because he's there, you know, he's got to get it fixed, he

19   can't go nowhere, and then you surround the -- victim.  That

20   how youse do it."  And so this is very calculated and it's

21   directed to put the victim in a vulnerable situation so that

22   the defendant's proxies can then exploit, again, just all in

23   favor, all in the interest of collecting debts.  And so that

24   conduct is incredibly troubling.  It's violent and it poses a

25   grave risk of harm to the community, that he is willing to

1  engage in this kind of violence, to discuss with others

2  engaging in this level of violence simply over money.

3        I think that what the crimes and the defense

4  submission portray is a man with two faces.  I think he has the

5  face that he presents to his family, to his friends, to the

6  community of a kind and generous and loyal man.  But that's not

7  the only face that he has.  The face, as the Court pointed out,

8  that he presented to his victims, that he presents to his

9  co-conspirators, is a very different face.  That's the face of

10  a man who's willing to utilize violence, that's the face of a

11  man who does not take no for an answer, that's the face of a

12  man who is willing to do whatever is necessary simply to recoup

13  gambling debts.  And that's a very different person than the

14  person whom I submit most of these people know.  But that is

15  just as much a part of the defendant as the other face that he

16  portrays.

17        I also submit that his charitable acts have two faces.

18  They certainly benefited the recipients.  There is no taking

19  away from the fact that when Mr. Parrello gave people money who

20  needed money, they then had it.  There's no taking away from

21  the fact that when Mr. Parrello gave someone, offered someone a

22  ride somewhere or meals, those are things that the recipients

23  of his generosity have.  But these acts are not entirely

24  selfless.  They also benefited the defendant.  They allowed him

25  to be beloved in the community, to commit crimes in the open,

H971pars

1    from his restaurant, and not be reported.  They allowed him to

2    commit serious crimes over and over again and still have the

3    support that the Court sees today, which, in the government's

4    experience, and probably in the Court's experience, is unusual

5    for a recidivist criminal.

6            This recidivism, the fact that he committed these

7    crimes after previously being sentenced to a term of 88 months,

8    is also incredibly troubling to the government.  First of all,

9    it demonstrates a real lack of remorse on the part of the

10   defendant, because he committed serious crimes which he was

11   previously sentenced for, and that long period of incarceration

12   did nothing to deter him from committing future serious crimes.

13   It gives the government no confidence that he is willing or

14   able to live a law-abiding life.  And I think it's important to

15   note that the defendant has had the support of his family, his

16   friends, and his community for years, for decades, and none of

17   that support has done anything to deter him from continuing to

18   commit crimes.

19           Similarly, the defendant's health issues.  While the

20   government does not want to in any way make little of them,

21   they are somewhat typical of that of a man of his age, and his

22   age and his health issues have not deterred him either.  He

23   committed the instant crimes well in his late 60s, and there is

24   nothing to suggest that these health issues, whether it's

25   hearing loss or other health issues, will deter the defendant

H971pars

1    in the future.  As the Court noted, the defendant's roles in

2    these crimes allowed him to stay sitting in his restaurant or

3    in his home.  And he could commit the crimes by having others

4    go out on the streets and engage in these crimes on his behalf,

5    and health issues will not prevent that kind of criminal

6    behavior.

7              So for all of those reasons, the government submits

8    that the defendant's request for a below-guidelines sentence is

9    not warranted.  It's not warranted in light of the seriousness

10   of the offense, it's not warranted in light of the need for

11   both specific and general deterrence, it's not warranted on

12   behalf of the victims of these offenses, and it's not warranted

13   in light of the characteristics of this particular defendant,

14   who continues to commit crimes despite serious prior prison

15   sentences.

16             THE COURT:  All right.  Thank you, Ms. Lonergan.

17             Mr. DeMarco, anything you'd like to say in response?

18             MR. DeMARCO:  Briefly, your Honor.

19             THE COURT:  Yes.

20             MR. DeMARCO:  I just wanted to point out, your Honor,

21   that the crimes that Mr. Parrello has pleaded guilty to were

22   committed in 2012.  That was roughly five years ago.  It was

23   exactly five years ago.  He's a different man today.  He's much

24   older.  He's much more infirm today than he was then.  And I

25   submit, ask Mr. Binder --

H971pars

1          THE COURT:  Well, in 2014 were the acts, the most

2    recent acts in the presentence report.  January, March, 2014.

3          MR. DeMARCO:  October 2012.

4          THE COURT:  I'm looking at paragraph 34.  33, 34 and

5    35 are certainly 2014.

6          MR. DeMARCO:  Early 2014, your Honor, yes, I found it.

7    The other two were in 2012, your Honor.

8          THE COURT:  Okay.

9          MR. DeMARCO:  My only other response to what the

10   government just argued to this Court is, I ask that this Court,

11   or anyone else, ask Mr. Binder or any one of these numerous

12   people in the audience or any one of the people that

13   Mr. Parrello helped during his or her time of need or at a low

14   point in their life, ask one of these people whether

15   Mr. Parrello was helping them or assisting them or being kind

16   to them to further any criminal enterprise.  It's our

17   contention, your Honor, that he was not being kind to

18   Mr. Binder or anyone else, either in this courtroom or anywhere

19   else, in order to further his criminal enterprise.

20          And with that, your Honor, I'll sit down.  Thank you.

21          THE COURT:  Okay.  Thank you, Mr. DeMarco.

22          Ms. Lonergan, anything you want to say?

23          MS. LONERGAN:  No, your Honor.

24          THE COURT:  All right.  So Mr. Parrello, as I said

25   before, you have a right to address the Court, and you're very

1    welcome to.  You're not required to, but if there is anything

2    you would like to say, then now is the time to do it.  You can

3    remain seated.  Just pull the microphone closer if you wish to

4    say something.

5           THE DEFENDANT:  First of all, I just want to apologize

6    for everything that transpired, and I feel remorseful.  These

7    things that I'm being accused of here, I'm taking my

8    responsibility, and just trying to be a better person

9    afterwards.

10          THE COURT:  Okay.  Thank you, Mr. Parrello.

11          All right.  We've been at this for a while.  What I

12   would like to do, if it's all right with you folks, is take a

13   short break.  Anybody who needs to use the restroom can do

14   that.  They're in the hallway.  The reason I want to take a

15   short break is, I've been thinking about this case for quite

16   some time.  I've been preparing.  I'm sort of known for that, I

17   guess, but I think all judges take it very, very seriously.

18   But I want to make sure always that I come to a proceeding like

19   this one open to hear things that might change my mind and to

20   reconsider, in light of arguments made or facts presented that

21   will encourage me to take a fresh look.  So I'm going to take

22   probably no more than ten minutes to just collect my thoughts,

23   think about what I've heard here today.  I'll then come back.

24   At that point I'll announce the sentence that I intend to

25   impose, I will explain my reasons for it, I'll check with the

H971pars

1    lawyers to make sure I haven't done something illegal or

2    improper.  Assuming not, then I will formally impose the

3    sentence.  So it won't take too much longer, but I'd like to

4    take a short break, if it's all right with you, okay?  So,

5    great.  Thanks a lot.  I'll see you in about ten minutes.

6             (Recess)

7             (In open court)

8             THE COURT:  Thank you.  Have a seat.

9             All right.  Thank you for your patience.  It is a

10   difficult thing to impose a sentence on another human being.

11   It's the hardest part of my job -- not intellectually but

12   emotionally and in terms of judgment, because as I think every

13   judge recognizes, in some sense, they're not up to the task;

14   they're not adequately able to judge another person.  And I

15   think everybody should know that going in, that this is a human

16   institution, and as human beings, we do the best we can.

17            I look at Mr. Parrello, and I have to say, this is a

18   complicated man.  Like most people, like most individuals,

19   whether they're defendants in a criminal case or not, he's

20   multifaceted, he has many different qualities, and I think

21   that's true in this case as well.  Many of you have written

22   about those qualities, and I thank you for writing.  I don't

23   think anybody's trying to snow me.  I don't think anybody is

24   being dishonest or lobbying me.  I think that you're being

25   sincere.  I think that you're in many cases being very sincere

1    and being very eloquent about a person you know and experiences

2    you've had with him and sharing those experiences to reflect a

3    side of him that I think is real.  So I don't think it's a con

4    job or anything like that.  The letters I got were too numerous

5    to read here.  There were a couple that I noticed and that I

6    thought were worth sharing, and it's just a couple, because the

7    things they said were representative of many other letters as

8    well.  But there was a letter, for example, from Mr. Squitieri

9    from the funeral home, and he said at the end of his letter,

10   which went into some detail about the kindness shown by

11   Mr. Parrello towards others, including Mr. Binder, but he said

12   at the end, "There is another side to this man -- a side that

13   respects tradition, honors patrons, and loves people.  He loves

14   his family and plays an important role in the lives of his

15   grandchildren.  I'm sure that his absence has affected him and

16   the children immensely."  And I think that's well said.  And I

17   have no reason to doubt any of it.  I think it's all true.

18          I got another letter from Anthony Sacco, who, again,

19   described a lot of things in detail, but he said at the end,

20   "So the definition of character is this: the aggregate of

21   features and traits that form the individual.  Mr. Parrello's

22   aggregate is comprised of honesty, generosity, devotion, and

23   sincerity.  It's imperative that a man like this be treated

24   fairly and just.  He is and always will be a very large part of

25   many people's lives."  And that's very well said, I think.  It

H971pars

```
1    is certainly the case that Mr. Parrello is a large part of many
2    people's lives, and will be no matter what sentence I hand down
3    today.  And that's to his credit.  Look, it's to Mr. Parrello's
4    credit that there are so many people here today, who have
5    written letters, who are here standing with him to show
6    support, who are willing to share, in some cases, very intimate
7    experiences that they've had with him at times of great
8    vulnerability in their lives when they were down and out, and
9    they shared that with the Court because they thought it was
10   important that I see that side of this man's character.  And so
11   I credit that.  I credit all of that.  I recognize that this is
12   a man who's capable of real kindness and real generosity, real
13   acts of charity and friendship, that he takes his family
14   relationships very, very seriously, and that those close to him
15   are suffering as they're separated from him.  But of course
16   there is more than just the qualities of generosity and honesty
17   and kindness that are described in the letters, and I think
18   many of the letter writers are largely unaware of the crimes
19   charged in this indictment and admitted to in the guilty plea
20   that are set forth in detail in the presentence report, and so
21   in many cases you can't know these things and, my sense is,
22   perhaps wouldn't want to know them, because they are very much
23   at odds with the man you know.  They're different than the
24   experiences you have had.  But they are also true.  I mean,
25   nobody has a monopoly on truth, and there's a lot of truth that
```

H971pars

gets presented at a sentencing.  Each person has their own

sense of the individual, and it is usually the case that no

defendant is all one thing or all another.  They're varied.

There's a lot there.  And so Mr. Parrello is certainly a varied

person with a lot of different qualities, good but also bad.

These crimes are serious crimes.  These are crimes of

violence.  That is ultimately what they are.  Mr. DeMarco made

the point comparing Mr. Parrello to another defendant whom I

sentenced in a case, and Mr. DeMarco represented that defendant

very ably, I might add, but that was a case where it was a debt

collection operation that was attempting to collect debts that

were sort of legally incurred, and the fraud, which maybe could

have been construed as extortion, was threatening people that

if they didn't pay, legal process, criminal legal process would

be brought against them, that there would be a warrant issued

for them.  This is very different than that.  None of the

people who were the victims in these crimes were threatened

that if they didn't pay, there would be a warrant for their

arrest; they were threatened with death or physical harm.

That's worse.  That is worse.  That is a violent crime.  And

violent crimes do tremendous harm, not just to the individuals

who are on the wrong side of the threats but to society at

large.  And so there's a reason why the penalties are high for

this kind of crime.

And I think, look, most everybody in this room is a

1     law-abiding person.  I have no reason to doubt that.  And

2     you've shown your support for someone who has committed serious

3     crimes, not once but multiple times, and that's to your credit.

4     But the fact is that these are serious crimes, and the law has

5     to speak to those.

6             Another factor that has to be considered is the fact

7     that this is not the first time.  One of the letters that I

8     received -- again, a very thoughtful letter, and this is not a

9     criticism, but one of the letters that I received, urging me to

10    be lenient, said Mr. Parrello would never take for granted a

11    second chance to prove himself and risk missing out on life's

12    gift.  But the reality is that he did take for granted a second

13    chance.  Mr. Parrello was prosecuted for racketeering back in

14    2001.  He pled guilty, was sentenced in 2003 to a sentence of

15    88 months.  That was the opportunity to turn it around.  And

16    most people who serve that kind of time do.  They recognize

17    that it is not worth it to go back to a life of criminality.

18    And yet Mr. Parrello did come back.  That's a reality that

19    can't be ignored.  Many of the arguments made today, very

20    eloquently, by Mr. DeMarco and by the people who wrote letters,

21    were made in 2003 to Judge Carter.  I mean, some of you wrote

22    more than one letter, I think.  I saw you wrote letters then.

23    Certainly Mr. Nadler wrote a letter and I think his mother

24    wrote a letter 15 years ago, 14 years ago.  The fact is that

25    many of these qualities that have been extolled, properly, were

1    on display 14 years ago.  And you don't get to keep making that

2    argument over and over.  The second chance has come.  You had

3    the second chance.

4            And so, Mr. Parrello, I'm just sort of struck by, this

5    is a choice you made to return to a life that is known to be a

6    life of crime and a life of violence, a life that leads to jail

7    and prison, and, in many cases, dying in prison.  I mean, that

8    is what happens to folks in this line of work when they go back

9    to it in their 50s and 60s.  That's just the reality.  There's

10   a long history of capos in crime organizations who die in

11   prison because they have continued committing crimes well into

12   their 50s and 60s.  And so it seems to me that, Mr. Parrello,

13   you must have understood this.  You had 88 months to think

14   about it the first time, and yet you returned to it.  You

15   returned to a life that all too often leads exactly to where we

16   are today.  And it can't be that you then roll out the same

17   arguments that "I'm a really good person," that "I'm good to my

18   family and I'm good to my community and I'm capable of

19   kindness."  All of which is true, but that can't be a "get out

20   of jail" card or "reduce the jail sentence" card.  It just

21   can't be after it's been done before.

22           So my job is to impose a sentence.  It's also to try

23   to explain a sentence.  And that's sometimes hard to do.  And

24   sometimes it's the greater responsibility.  Because each person

25   here today has come with a view as to what would be just based

1    on their own experiences.  And I respect that.  I do.  I have

2    to impose a sentence that I think is just based on all the

3    factors I've explained, which are generally broader factors and

4    involve more information and more consideration than many of

5    the decisions that you have to make as to what would be an

6    appropriate sentence.  And so I think it's important that as

7    I'm articulating this, you at least understand that this is a

8    careful process.  It's not kneejerk, it's not just reflexive,

9    it's not visceral and cruel; it is thoughtful.  It tries to be

10   careful, and tries to ultimately be wise, to the extent that

11   human beings can be wise.  My hope is that you don't leave here

12   so disappointed that you have less respect for the institution,

13   which are our institutions.  Our courts and our government are

14   our institutions.  My hope is that that confidence is not

15   shaken even by a sentence that you ultimately disagree with,

16   because as I said, I respect your right to disagree with the

17   sentence I impose and the fact that you're entitled to your

18   views as to what would be just.  We all are.  That's what it is

19   to live in a democracy.  But my responsibility is to impose

20   that sentence.  And in light of everything that I've seen,

21   everything I have heard, everything I have read, including the

22   arguments made 14 years ago in front of Judge Carter, it seems

23   to me that a sentence of seven years is appropriate.  That's

24   within the guidelines that I found.  It's above the guidelines

25   the government and the defense agreed to, but I just think

H971pars

1    anything less than that would be wrong.  I just think that

2    sentences typically don't go down over time, they go up.  And I

3    think everybody should be on notice of that, and particularly a

4    man as intelligent and thoughtful as Mr. Parrello should have

5    been aware of that.  So that's the sentence that I intend to

6    impose.  Concurrent on each of the counts of conviction.

7         I'm also going to impose a term of supervised release

8    of three years, with terms and conditions that I'll announce

9    formally, but they track what's in the presentence report.

10        Probation has recommended a fine.  Nobody has really

11   talked much about a fine here today.  It does seem that

12   Mr. Parrello has more assets than most defendants that I

13   sentence.  So I will impose a $15,000 fine as recommended by

14   probation, along with a $300 special assessment and forfeiture

15   in the amount of $68,300, which has already been agreed to by

16   the parties.

17        So that's the sentence that I intend to impose.  Is

18   there any legal impediment to my imposing that sentence,

19   Ms. Lonergan?

20             MS. LONERGAN:  No, your Honor.

21             THE COURT:  Mr. DeMarco?

22             MR. DeMARCO:  There is no legal impediment, your

23   Honor, but I just want to note my objections to the

24   enhancements you made to the guidelines previously.

25             THE COURT:  Yes.  I think that those are already

H971pars

1    preserved for the record, but in any event, that's fine.

2              MR. DeMARCO:  In case they weren't.

3              THE COURT:  Okay.  So Mr. Parrello, would you please

4    stand.

5              Mr. Parrello, having accepted the guilty plea that was

6    made before Judge Netburn, having adjudged you guilty on the

7    three counts, I now sentence you as follows:

8              I sentence you to a term of incarceration of seven

9    years, that's 84 months, to run concurrent on each of the

10   counts.  That will be followed by a term of supervised release

11   of three years on all counts, also to run concurrently.  That

12   term of supervised release will include the following

13   mandatory, standard, and special conditions:

14             First, that you will not commit another federal,

15   state, or local crime;

16             Second, that you may not unlawfully possess a

17   controlled substance;

18             Third, that you will submit to drug testing within 15

19   days of your release and twice thereafter.

20             You will cooperate in the collection of DNA as

21   directed by the probation officer.

22             There are 13 standard conditions.  I will impose those

23   here as I do in every case.  I'll also impose the following

24   special conditions:

25             You are to provide your probation officer with access

1    to any requested financial information.  You are not to incur

2    new credit charges or open additional lines of credit without

3    the approval of the probation officer.

4            You must submit your person, your residence, your

5    place of business, your vehicle, or any property, including

6    electronic devices under your control, you must consent to a

7    search of those things if the probation officer believes there

8    may be evidence of a crime or evidence of a violation of the

9    conditions of your supervised release.  You have to consent to

10   that.  You have to allow that to take place.  You can't refuse.

11   You also haven an obligation to disclose to any persons with

12   whom you share these premises that you are subject to this

13   search requirement, and this is to allow them to take steps to

14   preserve their property and their privacy.  Okay?

15           I'm going to have you supervised in the district of

16   your residence.  That's this district.  You are to report to

17   the probation office within 24 hours of your release from

18   custody.  So unless the next day is a holiday or a weekend,

19   then you should go the very next day from when you're released.

20           I'm going to impose a special assessment of $300 --

21   $100 for each count of conviction.

22           I'm going to direct that you pay a fine of $15,000 to

23   be paid in monthly installments of 10 percent of your gross

24   monthly income over the period of supervision to commence 30

25   days after your release from custody.  I guess if you're

H971pars

1  earning money while you're in jail, then I'll ask you to also

2  submit 10 percent of what you get from a job program in prison

3  to the payment of the fine.

4          And then there is a forfeiture of $63,800.  I think I

5  inverted that before, but it's $63,800.  That's pursuant to an

6  agreement executed by the parties on the day that you pled

7  guilty.

8          Are there any open counts, Ms. Lonergan?

9          MS. LONERGAN:  Yes, your Honor, there is an underlying

10 indictment that the government moves to dismiss at this time.

11         In addition, your Honor, the government asks that the

12 Court keep the judgment open for 45 days with respect to

13 restitution.  As the government made clear before, we have

14 reached out to the victims, but we would like to do that one

15 more time pursuant to their rights under the statute, to reach

16 out to them one more time to see if they have restitution

17 claims.  And we will submit that first to defense counsel and

18 then to the Court in 45 days.

19         THE COURT:  All right.  The law allows that, so any

20 objection to that, Mr. DeMarco?

21         MR. DeMARCO:  No, your Honor.

22         THE COURT:  Okay.  So I'll allow restitution.  I'll

23 keep the judgment open with respect to restitution.  Otherwise

24 I will docket the J of C probably in the next day or so.

25         I should tell you, Mr. Parrello, you have the right to

H971pars

1    appeal this sentence.  I sentenced you actually above what your

2    plea agreement said would be the range.  I found a different

3    range, as I have obviously the right and responsibility to do

4    when I think appropriate.  But because of the sentence I

5    imposed, you've got a right to appeal, so if you wish to

6    appeal, you would need to file a notice of appeal within two

7    weeks.  So talk to your attorneys about that.  They'll assist

8    you in filing the notice.  That's not the full-blown appeal;

9    it's just a notice saying you intend to appeal.  That's a

10   pretty strict deadline, so you have to comply with that.  So

11   two weeks from today or probably two weeks from tomorrow at the

12   latest.  Okay?

13           All right.  Is there any recommendation you'd like me

14   to make with respect to where --

15           MR. DeMARCO:  Actually there are several matters I'd

16   like to address.

17           THE COURT:  Okay.  You can have a seat.

18           MR. DeMARCO:  Your Honor, the recommendation with

19   respect to his designation, I'd like the Court to recommend FCI

20   Danbury, as I put in my papers.  Danbury is 70 miles from

21   Mr. Parrello's home, so it would give access to his wife and

22   his grandchildren for visitation purposes.  It also has a

23   health clinic and a hospital nearby, which, given his age and

24   health concerns, would be the appropriate designation, and so

25   we're going to ask that your Honor specifically designate FCI

H971pars

1      Danbury.

2            THE COURT:  Okay.  I'm happy to recommend that.  I

3      can't order it, but I can recommend it.  And the Bureau of

4      Prisons I think certainly attempts to honor those

5      recommendations, so I will make that recommendation.

6            MR. DeMARCO:  Thank you, your Honor.

7            There is also -- I raised this with the government and

8      I'm also going to raise this with the Court; at least make it

9      part of the record.  Since his arrest there's been separation

10     orders in place, and as I stated previously, among other

11     things, the separation orders prevent Mr. Parrello from

12     attending religious services.  We ask that since the case is

13     final as of today, that the separation orders be lifted so that

14     Mr. Parrello has access throughout the prison to attend

15     religious services and so on and so forth.

16           THE COURT:  I don't know that I can order or even

17     recommend that separations be lifted.  I think the government

18     and the Bureau of Prisons -- to the extent there are

19     separations that are no longer necessary, then they should be

20     lifted.  But it would seem to me, even with separations, there

21     should be steps that could be taken to make sure that

22     Mr. Parrello is able to participate in religious observances.

23           MR. DeMARCO:  There should be, but there haven't been,

24     your Honor.

25           THE COURT:  Well, that's something to be taken up with

H971pars

the Bureau of Prisons.  I'm happy to make that part of the

recommendation, that he be --

MR. DeMARCO:  Please.

THE COURT:  -- allowed to participate in religious

observances, and I'm happy to even make a call to the Bureau of

Prisons about that.  The legal counsel over there, Adam

Johnson, is generally very receptive.

MR. DeMARCO:  He's at MCC.

THE COURT:  He's counsel for both.

MR. DeMARCO:  He's very receptive.  I don't know if

he's empowered to --

THE COURT:  He's legal counsel for both.  So that's

usually my first call, and I'm happy to make that call.  I

think that's important that Mr. Parrello have that opportunity.

One might argue he even has a right to it.  So --

MR. DeMARCO:  I have in hand a bank check, an official

bank check in the amount of $63,800, which will satisfy the

balance of the agreed-upon forfeiture.  It's made out to US

Marshal Services, and I'm providing that to the government.

THE COURT:  Okay.  That's fine with me.  I'm not sure

that's the best way to get the check handed off, but you've

done it on the record.

MR. DeMARCO:  I prefer to do it this way than to lose

it somewhere along the way, your Honor.

THE COURT:  So Ms. Lonergan, you've got it.

1          MS. LONERGAN:  Yes, your Honor.  With reluctance, but

2     yes.

3          THE COURT:  Okay.

4          MR. DeMARCO:  Finally, your Honor, if your Honor

5     noticed, in my submission, I made a request for this Court to

6     consider allowing -- I mean, this is unorthodox, but to permit

7     Mr. Parrello the opportunity to surrender voluntarily and allow

8     him to be released on bail for a short period of time to attend

9     to his dental and medical needs.  I submit he's not a risk of

10    flight, and we proposed a bail package in the amount of a

11    million dollars or $2 million secured by real property, and the

12    signatures of some financially responsible people will ensure

13    his surrender on any date that's designated by this Court.

14         THE COURT:  All right.  I'm going to deny that

15    request.  The standard for bail pending appeal is different

16    than the standard for bail pending trial or bail pending

17    sentencing.  And I don't think Mr. Parrello would meet those

18    standards.  So there may be other ways.  You might want to talk

19    to the Bureau of Prisons about ways to get those dental issues

20    resolved.  I think it's obviously something I take seriously.

21    I guess we had another defendant in this case who had some

22    dental issues but that was bail pending sentencing, which is a

23    different standard than bail pending appeal.

24         MS. LONERGAN:  Your Honor, one moment.

25         THE COURT:  Yes.

H971pars

1              (Counsel conferring)

2              MR. DeMARCO:  That was a conversation regarding

3      designation, your Honor.  We're going to stick with our request

4      that your Honor recommend Danbury.

5              THE COURT:  Okay.  I mean, that's fine.  I think that

6      for all the reasons you said, it sounds to me like it might be

7      an appropriate place, so I'll make the recommendation, but the

8      Bureau of Prisons may have a different view based on some of

9      the medical issues you mentioned.  They may want him closer to

10     a different --

11             MR. DeMARCO:  They may send him to defense or

12     somewhere else, but it would be ideal if he were sent to

13     Danbury, and I think the Court's recommendation would be a step

14     in the right direction.

15             THE COURT:  I'm happy to make that recommendation, as

16     I said.

17             Anything else?

18             MR. DeMARCO:  No, thank you, your Honor.

19             THE COURT:  All right.  Anything from the government?

20             MS. LONERGAN:  No, your Honor.  I just want to note,

21     the Court, of course, is free and it's fine to call Adam

22     Johnson, and we agree that the fact that he has not been able

23     to attend religious services is an issue.  I believe it should

24     be less of an issue once he's designated.  I think first of

25     all, we will very much consider whether we can lift the

H971pars

1   separations, and if we can, we will, but regardless, there

2   should be fewer separations because he won't be with his

3   co-defendants, and I think also that the penal institutions as

4   opposed to the jails have more flexibility for things like

5   religious services.

6              THE COURT:  Right.  I think the goal is, even before

7   he gets designated to his final facility, that he be able to

8   get to go to mass if he wants while he's at the MCC or the MDC.

9              MS. LONERGAN:  Yes, your Honor.  I hope that it's a

10  problem that will in a short time resolve itself.

11             THE COURT:  Okay.  All right.  Let me end with this.

12  It's been a long day and it's a draining day, and I'm sure for

13  many of you there is a disappointing result.  I don't know what

14  people expected when they came in, and it's not really my job

15  to try to make sure people leave happy or satisfied, but it is

16  my job to make sure they leave feeling respected and that they

17  were taken seriously.  I did take these letters seriously.  I

18  made my decision based on what I explained the different

19  factors to be.  But I do think that obviously Mr. Parrello is a

20  person who has touched many lives, and I hope you'll continue

21  to support him while he's serving this sentence.  Continue to

22  support his family emotionally.  And Mr. Parrello, I hope

23  you'll continue to be a part of the lives of the people who are

24  counting on you, in particular your grandchildren, who really

25  are hurting, I'm sure, and need and want you to be a part of

H971pars

1   their lives, so I hope you'll do that, but I hope you'll also

2   reflect on what got you here, because this is a cycle that just

3   can't be tolerated, and it's so harmful to individuals and also

4   to a larger community.  This is not just a way of life.  This

5   is criminal conduct that has huge, huge consequences on real

6   people.  And it's violent.  And that is something that the law

7   and legal institutions have firmly condemned, and that's what

8   this sentence, at least in part, was designed to do.

9           So good luck to all of you.  Thank you for being here.

10  Mr. Parrello, good luck to you.  I wish you the best.  Okay?

11          Let me thank the Marshals, let me thank the court

12  reporter.  Have a good day.

13          (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25