Haencaps

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                          16 Cr. 522 (RJS)

5   PASQUALE CAPOLONGO,

6              Defendant.

7   ------------------------------x

8
                                          October 3, 2017
9                                         2:10 p.m.

10  Before:

11
                   HON. RICHARD J. SULLIVAN,
12
                                          District Judge
13

14

15                        APPEARANCES

16
    JOON H. KIM
17       Acting United States Attorney for the
         Southern District of New York
18  BY:  AMANDA K. KRAMER
         Assistant United States Attorney
19
    MARTIN RASKIN
20       Attorney for Defendant

21

22

23

24

25
```

Haencaps

1          (Case called)

2          THE COURT:  Have a seat.

3          Thank you.  Good afternoon.

4          Let me take appearances.

5          For the government?

6          MS. KRAMER:  Good afternoon, your Honor.  Amanda

7    Kramer, for the government.

8          THE COURT:  Ms. Kramer, good afternoon.

9          For the defendant.

10         MR. RASKIN:  Good afternoon, your Honor, Martin Raskin

11   on behalf of Mr. Capolongo, who is present in court.

12         THE COURT:  Mr. Raskin and Mr. Capolongo, good

13   afternoon.  Please take a seat.

14         You have some friends and family members here, is that

15   correct?

16         MR. RASKIN:  No.

17         THE COURT:  You are just here to watch.  That is fine

18   too.  Anybody who wishes to watch can watch, so thank you for

19   being here.

20         We are here for sentencing.

21         MR. RASKIN:  We are, your Honor.

22         THE COURT:  Mr. Capolongo pled guilty before we back

23   on May 12.  I want to go over with everybody what I have

24   reviewed in connection with sentencing.

25         If I have left anything out, of course you should let

Haencaps

1    me know.  I have, first of all, reviewed the transcript of the

2    guilty plea that took place on May 12.

3            I was here for it, but I think it's a good practice to

4    go back and review what was said and what was discussed.  So I

5    have done that.

6            I have also reviewed the probation report prepared by

7    the probation department.  That report is 41 pages long, single

8    spaced.  It is quite extensive.  It also includes a sentencing

9    recommendation.

10           I have reviewed Mr. Raskin's sentencing memorandum,

11   which is nine pages double spaced with a number of attachments,

12   principally letters from friends and family members of Mr.

13   Capolongo.  So I have read all those, and I thank those who

14   took the time to write.

15           I have reviewed the government's sentencing

16   memorandum, which is dated September 26.  That is a ten-page,

17   single-spaced submission.

18           And then I have reviewed the consent preliminary order

19   of forfeiture and money judgment that was already issued in

20   this case and docketed at the time of the plea.

21           So that's what I have.

22           Is there anything that I have overlooked, Ms. Kramer?

23           MS. KRAMER:  No, your Honor.

24           THE COURT:  Mr. Raskin?

25           MR. RASKIN:  No, your Honor.

Haencaps

1          THE COURT:  I should say that I have sentenced now I

2    think 11 other defendants in this case.  This is a sprawling

3    case that's got about 46 defendants.  I have sentenced I think

4    11 of them so far.  Every time I sentence someone, there might

5    be some overlap of facts, and so I am informed by those

6    experiences as well.

7          The ranges of sentences are from time served to 84

8    months, which is Mr. Parrello's sentence at the high end, and

9    then yesterday, in case anybody missed it, I sentenced Anthony

10   Camisa to 66 months.

11         So, all right.  Let me ask you, Mr. Raskin, have you

12   received a copy of the presentence report?

13         MR. RASKIN:  Yes, your Honor.

14         THE COURT:  You have reviewed it with your client?

15         MR. RASKIN:  I have.

16         THE COURT:  Do you have any objections to what is in

17   the report?

18         MR. RASKIN:  I do not.

19         THE COURT:  OK.

20         Ms. Kramer, you have received a copy of the

21   presentence report?

22         MS. KRAMER:  Yes, your Honor.  No objections.

23         THE COURT:  No objections.  OK.

24         So, Mr. Capolongo, you may remember on the day you

25   pled guilty I told you the different factors that a Court has

Haencaps

to consider in fashioning a sentence.  One of those factors

that I mentioned was the United States Sentencing Guidelines.

Do you recall that?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  I explained how those work and what those

are, and I think I waved them around at some point.

So here's the book.  This is the sentencing guidelines

book.  This is a book that's put out by a commission, in this

case, the United States Sentencing Commission, which consists

of some judges and some lawyers and some experts in the field

of criminal law.

The way it works is that this book is designed to give

guidance to judges like me who have the responsibility of

imposing sentences on real people.  So, for every crime or type

of crime, there is a chapter in this book, and the judge in a

particular case is instructed to go to the chapter that relates

to the crime that the defendant pled guilty to or was convicted

on, and once in that chapter, the judge is prompted to make

certain findings, findings of fact.

And so there is a chapter on gambling, and the judge

in that chapter is prompted to make findings about the amount

of the gambling activity, the dollar value.  The judge might

also consider things like whether the defendant was a leader or

an organizer of criminal activity that was extensive and other

things that might cause the judge to increase the offense

Haencaps

1    level.

2            So, the judge's task is to basically make findings.

3    Based on those findings, the judge assigns points.  The judge

4    then adds those points up and comes up with a number.  That

5    number is the offense level.

6            The judge then goes to another chapter in this book

7    and that's the chapter that relates to criminal history.  Not

8    surprisingly, people who have been convicted before, people who

9    have gone to prison before, they are typically going to be

10   treated more harshly than people who have no prior convictions

11   or convictions that resulted in very short periods of time in

12   prison.

13           So I would go to the chapter on criminal history.  I

14   will make findings about whether there were prior convictions,

15   when they were, and how long the sentences were.

16           Based on the answers to those questions, I will assign

17   points.  I'll come up with another number after I add up all

18   the points.  That number is referred to as the criminal history

19   category.

20           There are six criminal history categories.  Category I

21   the lowest; category VI is the highest.  With those two numbers

22   I talked about, the offense level on one hand and the criminal

23   history category on the other, I will then go to the back of

24   the book, where there is a table or grid, sort of a chart.

25   There is a column is here on the far left, which is the offense

Haencaps

1    level column.  I will go down that column.  It's numbered 1

2    through 43, and I will keep going until I get to the number

3    that I have found to be appropriate in this case.

4             I will then go across these other columns from left to

5    right, each of which reflects a criminal history category, I

6    through VI.  I will keep going until I get to the one that is

7    appropriate.  I will stop there.

8             Where my finger rests on this chart, that is the range

9    that in the view of the commission that prepared this book

10   would be appropriate.  It is a range in terms of months.

11            So that's how this book works.  We are going to spend

12   a little bit of time talking about it and how it applies in

13   this case.  It can seem a little dry, but it is important.

14            This is not the whole ballgame.  This is not

15   mandatory.  I don't have to follow this book.  I'm free to

16   sentence above or below the range in this book.  There are

17   other factors that are just as important as this book.  I will

18   mention those in a minute, but for now we are going to focus on

19   the calculation as it applies here.

20            Any questions so far, Mr. Capolongo?

21            THE DEFENDANT:  You have been very thorough.

22            THE COURT:  It is important so I want to make sure you

23   understand.  If at any point you have any questions, let me

24   know.

25            OK.  According to the presentence report, beginning on

Haencaps

page 19, the probation department sets forth its view as to how the guidelines apply here.  There is a base offense level of 12 because of the gambling activity that was involved.

Pursuant to Section 2E3.1, there is then a two-level reduction because you accepted responsibility by pleading guilty before trial, so that's level 10.  That puts you down to level 10.

There was an agreement between you and the government in this case, along with about 35 other defendants, each of whom agreed to plead guilty by a certain date in order to break the logjam, to sort of clear up and resolve what was otherwise a sprawling, very labor-intensive case.

So, in exchange for helping break that logjam, for making things move efficiently, the government agreed that if you pled by a certain date and a critical mass of other defendants did the same that you would be entitled to a one-level reduction, an extra one point off.

Now, I am not bound by that.  That is an agreement you had with the government.  I don't have to follow that.  But in this case I'm prepared to.  I have in all the other defendants that I've sentenced so far.  It seems to me that that strikes a good balance between the need to efficiently resolve a case like this and to reward those who agreed to plead guilty in a pretty fast and efficient way without overrewarding it.  So one level strikes me as appropriate.  So I am going to reduce your

Haencaps

offense level one more level.  That puts you at level 9.

Now you have a number of prior convictions.  It's a
sort of staggering number of prior convictions.

You have a conviction from 1981, when you were about
30, for possession of gambling records.  That resulted in a
10-day term of imprisonment.

You then had another one a couple of years later, in
1983, possession of gambling records.  That also led to a
sentence of imprisonment, relatively short, 45 days.

1984, same charge, also convicted 1984 to 60 days'
imprisonment.

Another 1984 conviction resulting in a sentencing of
30 days' imprisonment.

A month later, another 1984 that resulted in a $1,000
fine in November.

1985, a 90-day term of imprisonment, also for
possessing gambling records.

1986, also promoting gambling in the second degree, a
$1,000 fine.

1987, possession of gambling records again, $1,000
fine.

1989, promoting gambling in the first degree in Nassau
County.  That resulted in a sentence of sixteen months to four
years.

Once you got out -- well, no, then you had -- no,

Haencaps

1    that's right.

2           Then four years later, about three and a half years

3    later, you had another conviction for promoting gambling in the

4    first degree.  This time in Westchester.  That resulted in a

5    16-month to four-year sentence.

6           And then 1999 an eighteen-month to three-year sentence

7    for promoting gambling in the first degree in the Bronx.

8           In 1998, you were arrested for extortion in Brooklyn

9    in a federal case.

10          And then in 1999 you were sentenced to 46 months'

11   imprisonment and three years of supervised release.

12          For that you get three criminal history points, as you

13   did for the 1999 conviction in the Bronx.  Three criminal

14   history points.

15          Then you had another conviction in 2016 for promoting

16   gambling in the first degree in Rockland County.  That resulted

17   in a conditional discharge, and that doesn't result in any

18   additional points because that sounds like it was part of the

19   same conduct that you are being sentenced for here today.

20          That is a lot of convictions.  Ultimately, six

21   criminal history points, and that puts you into Criminal

22   History Category III.

23          So does anybody disagree with that?

24          MR. RASKIN:  We agree with that, your Honor.

25          THE COURT:  You agree with that.

Haencaps

1          Ms. Kramer, you agree also?

2          MS. KRAMER:  Yes, your Honor.

3          THE COURT:  According to the presentence report there

4    is another charge that's pending in Florida for racketeering

5    and bookmaking in Broward County.  I don't know much about

6    that.  It says the defendant is scheduled to enter a guilty

7    plea in July of 2017.  So that's come and gone.  What is going

8    on with that case?

9          MS. KRAMER:  Your Honor, the defendant is scheduled to

10   be sentenced on October 11.  Our understanding from the

11   prosecutor in that case is that they are awaiting the

12   sentencing in this case so that if the judge wants he can run

13   the sentences concurrent so that the defendant can serve any

14   time in federal prison.

15          In connection with that case, the state law

16   enforcement seized gambling ledgers and $526,000 from the

17   defendant at the time of his arrest in that case.

18          THE COURT:  OK.

19          MS. KRAMER:  So he's scheduled to be sentenced in less

20   than a week or actually eight days.

21          THE COURT:  All right.

22          Then there is another 1976 and 1991 case.  One was

23   reversed on appeal.  That's the 1991.

24          The '76 there is no information available, so I am not

25   going to consider it unless there is additional information you

1  want to share with me.

2          No?

3          MR. RASKIN:  No, your Honor.

4          THE COURT:  All right.

5          So, offense level of 9, Criminal History Category of

6  III yields an 8 to 14 month range.

7          But, as I say, I am free to go above or below, and

8  given this criminal history, that's certainly something to

9  think about it, including the recent criminal history.

10          There are, however, other factors that are just as

11  important.  So I want to remind you of what those are.

12          Mr. Capolongo, I told you back when you pled guilty

13  what they were, but just so you know or just so you remember,

14  they include -- in addition to these guidelines they, first of

15  all, require me to consider your own personal history.  So I

16  have to look at your whole experience, not just this crime, but

17  everything that makes you who you are.

18          You are a unique individual.  You are different than

19  anybody I've ever met or sentenced or will meet or will

20  sentence, and I have to make sure that the sentence I impose

21  here in this case is tailored to you as a person.

22          So I have to look at the whole person.  That means

23  from your birth right up until now.  So I've gotten some

24  letters that tell me more about you than I would otherwise

25  know, and it's helpful to know that, people who speak very

Haencaps

1    highly of your character and your kindness and your generosity,

2    and those are good things to know.

3         There are things also in the presentence report that

4    are very specific to you that are relevant to my determination

5    as to what's an appropriate sentence, including your criminal

6    history.  I mean, that is partly covered by this, but it's not

7    fully covered by this if one considers the sheer number of

8    prior convictions.

9         So those are things I have to consider.

10         Another factor that I have to consider involves the

11    facts and circumstances of this crime.  This is a serious

12    crime, and I have to make sure that the sentence I impose

13    reflects the seriousness of this crime, that it promotes

14    respect for the law, but it also provides a just punishment for

15    this crime.  So that's another factor that I have to take into

16    account.

17         I have to consider the need also to deter or

18    discourage you and other people from committing crimes of this

19    kind in the future.

20         That's the hope, that by imposing a sentence on you in

21    this case today, I'll send a message to you so that you just

22    get it through your head that you can't do this anymore.

23         Given the number of prior sentences, the number of

24    months that you have previously served, it is a not clear to me

25    that much of anything is going to get through, but I have to

Haencaps

1    consider that.

2           I also have to consider the impact of this sentence on

3    other people who might learn about your sentence and what

4    impact that will have on them and their likelihood to commit

5    future crimes.  So I have to consider that, use my best

6    judgment.

7           I have to consider your own needs while you are in

8    custody.  You look to be pretty healthy, but you are of an age

9    at which people have health issues that have to be monitored

10   and have to be treated.  So I have to make sure that those

11   health issues are going to be addressed for any period of

12   incarceration that I impose, and there might be other things

13   unrelated to health that still require that whatever sentence I

14   impose allows you to get treatment, to get some sort of

15   programming.

16          So, for example, some people have substance abuse

17   treatment needs that have to be addressed, some have mental

18   health treatment needs.  Some of the younger defendants I

19   sentence really just need the opportunity in many cases to get

20   a GED or to learn a skill or a trade.

21          So those are all things that I have to consider.

22          And then another factor, the last one I guess that's

23   worth mentioning, is the need to avoid unwarranted disparities

24   between you and other similarly situated defendants.  That's

25   the hope, that by imposing a sentence on you here today that I

Haencaps

1   will sentence you consistently with how other judges have

2   sentenced, and I guess not just other judges, me too, how other

3   individuals have been sentenced who have engaged in similar

4   conduct where they have similar histories as yourself.  So

5   there is a need for consistency.  That's really what it's

6   about.

7           So my job is to balance all of those things and to

8   come up with a sentence that I think is appropriate in light of

9   those different factors.

10          So that's sometimes more of an art than a science.

11  What we will do now going forward is, I have read all the

12  letters and submissions.  I will then ask the lawyers if

13  there's anything else they would like to say.  I will start

14  with Mr. Raskin.  I will then give Ms. Kramer a chance to

15  speak.

16          Once they have done that, I may have some questions.

17  Then after that I will give you an opportunity to speak, if you

18  would like.  You are not required to, but you certainly have a

19  right to.

20          That's the drill.

21          Do you have any questions about any of that?

22          THE DEFENDANT:  No, your Honor.

23          THE COURT:  So, Mr. Raskin.

24          MR. RASKIN:  Yes, your Honor.

25          I know that the Court has read everything, and I will

Haencaps

1    not dwell on what we have filed and what is contained in the

2    presentence report.

3              I just want you to know that the Pat Capolongo

4    standing before you today for sentencing is not the same Pat

5    Capolongo who was involved in the charges in the information.

6              THE COURT:  Why do you say that?

7              MR. RASKIN:  Since that time, he's retired.

8              THE COURT:  Retired from what?

9              MR. RASKIN:  Well, the most recent thing that he was

10   doing was working for his brother's landscaping firm.

11             How long have you been retired now?

12             THE DEFENDANT:  About six years.  Six or seven years.

13             MR. RASKIN:  Six years.  He is retired.  He is in ill

14   health.

15             The presentence investigation report lists the

16   ailments and the doctors that he's seeing for his health.  He

17   literally stays home these days caring for his grandchildren,

18   ages 8 and 4, drives them to school, cooks for them, takes them

19   to afterschool activities, and takes care of all of the other

20   things that they need while their mother both works and goes to

21   school.

22             THE COURT:  How long has he been doing that?

23             MR. RASKIN:  Since they were born.

24             THE DEFENDANT:  About eight years.

25             THE COURT:  That's the point.  It hasn't stopped him

Haencaps

1   from engaging in this kind of conduct, right?

2              MR. RASKIN:  He's also been on bond for years now.

3   This is the third case, and he clearly has not been involved in

4   illegal activities for the years that he's been on bond.

5              We recognize that as a --

6              THE COURT:  The Broward County case he was arrested in

7   2015.

8              MR. RASKIN:  Yes.  Then there was a Rockland County

9   case before that.  I think that might have been '14.

10             THE COURT:  That was 2014.

11             MR. RASKIN:  Yes.  So he's been to bond since then in

12  three jurisdictions.

13             Again, we certainly do not dispute the fact that

14  Mr. Capolongo has been a lifelong gambler.  He has been and he

15  was involved in the gambling business in this case, so that's

16  why he pled guilty.

17             He was both a pay and collect person for an offshore

18  Internet site, and he bet on behalf of himself and others on

19  sporting events.

20             In the Florida case -- I mean, I would submit that

21  these three cases have opened his eyes.  He's paid dearly.  In

22  the Florida case he forfeited over $500,000, which was

23  literally his life savings in a safe deposit box.

24             THE COURT:  In 1999 he got 46 months at the age of 50.

25  That was a pretty serious operation, and it didn't prevent him

Haencaps

1    from going back to it.

2                    MR. RASKIN:  Yes.

3                    You know, again, he wasn't in trouble again until this

4    series of related cases.

5                    THE COURT:  It doesn't mean he wasn't doing it.  It

6    means he didn't get caught.  I don't know.

7                    MR. RASKIN:  I would submit that perhaps he wasn't

8    doing it.  I am hard pressed to tell you what he was or wasn't

9    doing then, Judge.  I'm sorry.

10                   Nobody is more contrite at this point than

11   Mr. Capolongo on how his misconduct has affected not only him,

12   but his family and those around him.  You have read the letters

13   presented.  You know that, according to his friends and family,

14   this is a well loved, good and decent man.

15                   We reviewed the presentence report.  We saw

16   probation's recommendation of four months' imprisonment, three

17   years supervised release, with four months' home detention.

18                   We think it is appropriate.  We think the Court should

19   impose it.  We think that it is sufficient, but not greater

20   than necessary, to meet the goals of 3553.

21                   If the Court imposes that kind of a sentence, he can

22   server it get back to his family and caring for his

23   grandchildren in the not-too-distant future.  So we are asking

24   the Court to accept probation's recommendation.

25                   THE COURT:  All right.

Haencaps

1          Thank you, Mr. Raskin.

2          MR. RASKIN:  Thank you.

3          THE COURT:  OK.  Ms. Kramer, is there anything you

4     would like to say.

5          MS. KRAMER:  Thank you, your Honor.

6          I am perplexed by the claim that the defendant has

7     been retired for eight years, because paragraph 110 of the

8     presentence investigation report says that he's been retired

9     over the course of the last 20 years.

10          So I am not sure exactly what the timing is of his

11    retirement according to the defendant.  But, as evidenced by

12    the recordings in this case, he clearly has not been retired

13    from his criminal gambling activity, and his criminal history

14    really speaks for itself.  This is a case that really cries out

15    for a guidelines sentence to effect specific deterrence.

16          THE COURT:  Yesterday the government was arguing for

17    an above-guideline sentence for Mr. Camisa, who was 21 when he

18    engaged in most of the crimes.

19          There was violence associated with it, but it was

20    collecting debts from a gambling operation that was in essence

21    this gambling operation or a parallel gambling operation, but

22    that was one where the government was seeking an upward

23    departure on a sentence that was already basically going to be

24    over five years.

25          This is an individual, Mr. Capolongo, who's got, by my

Haencaps

count, 15 prior convictions, all for gambling activities.  He

served lengthy sentences as an adult, as a grown man, a mature

man in his 50s.  Yet he still has this case and then another

case in Florida where he's still going to be sentenced.

I am just thinking why you are not seeking an upward

departure here?

MS. KRAMER:  Well, the obvious distinction between the

two cases, your Honor, is the violence that was used by

defendant Camisa in his collection of the debt.

THE COURT:  Right.

MS. KRAMER:  Which obviously takes it into a very

different category.

While there was gambling debt that was collected and

this defendant was involved in a gambling operation -- are you

having trouble hearing me?

MR. RASKIN:  Yes, I was having trouble.

MS. KRAMER:  My apologies.

MR. RASKIN:  May I sit here, your Honor?

THE COURT:  That is fine.

MR. RASKIN:  Thank you.

MS. KRAMER:  So while the debt that was the subject of

the violent collection effort and the kidnapping in that case

was a gambling debt, what was notable about it is the violence

and is the use of the weapon.  So that was the reason there.

Here there have been a lot of gambling defendants in

Haencaps

1     this case who have received below-guidelines sentences.

2                THE COURT:  No, I don't think many.

3                MS. KRAMER:  No?

4                THE COURT:  I mean, there are guidelines sentences --

5     if your zone A or you are zone B --

6                MS. KRAMER:  Correct.  Excuse me, your Honor.  Who

7     have received noncustodial sentences, but that were guideline

8     sentences --

9                THE COURT:  Yes.

10               MS. KRAMER:  -- because of the allowance for home

11    detention within a guidelines range in the lowest zone.

12               In this case, your Honor, a guidelines sentence is not

13    as long as what this defendant has served before, but the

14    nature of his criminal conduct is just not as dangerous as that

15    of Anthony Camisa's.

16               THE COURT:  I am not saying he's dangerous.  There is

17    no evidence that in this conspiracy that Mr. Capolongo was

18    toting guns or ordering that people be threatened.

19               But, on the other hand, the sheer number of

20    convictions makes this a wildly different than most of the

21    other gambling defendants, at least the ones I've sentenced.

22               Would you agree to that or no?

23               Or am I mistaken?

24               MS. KRAMER:  That's correct, your Honor.

25               THE COURT:  Then, in terms of the amount of the

Haencaps

1    evidence, it seems that you were up on Mr. Capolongo's phone.

2    Is that what it was?

3            MS. KRAMER:  There was a state wire.

4            THE COURT:  So, there was a wiretap on his phone and

5    that might account for why there's so much more about him

6    that's sort of described in the offense section of the

7    presentence report, much more than for some other of the

8    defendants in this conspiracy.

9            But it sort of seems like Mr. Capolongo is running at

10   a different place than a lot of the other folks I have

11   sentenced.

12           He's in conversations in which he's sort of trading

13   insults with Mr. Merlino about who's a rat and who's not a rat.

14   And Mr. Capolongo is involved in a $100,000 collections, right?

15           I am looking at paragraph 43.

16           This is a 100,000 gambling debt, right?

17           MS. KRAMER:  Yes, your Honor.

18           MR. RASKIN:  What was that, your Honor?

19           THE COURT:  A hundred thousand dollar gambling debt in

20   paragraph 43 is being referred to.

21           MR. RASKIN:  That is not true.

22           THE COURT:  If it's not true, then we should have a

23   hearing on it.  Nobody is objecting to what I'm -- I will read

24   the paragraph.

25           "The CW placed another call to Allen, during which

Haencaps

1      Allen insisted that no deal was ever made."

2              This was with respect to the loss of $300,000

3      belonging to the Costa Rican gambling operation.

4              Allen said that CC6" -- whoever that is -- "Capolongo,

5      and a guy they referred to as Taylor who was in jail with

6      Merlino had a conversation about the debt owed by Camacho and

7      the CW.  A short time after this call, the CW called Capolongo

8      and again expressed concerns about Taylor coming after him.

9      Capolongo said that Capolongo had dinner with Taylor, and that

10     Capolongo told CC6 that he would handle the situation.

11             "CW told Capolongo that Taylor offered Merlino a

12     hundred thousand dollars to collect the money from the CW and

13     that the CW is with Parrello and not Merlino."

14             Then there is another meeting in which Merlino

15     instructed the CW to, Tell Capolongo, listen, I was told not to

16     pay you.  Don't use my name.

17             And then you later call Merlino a broken down valise.

18     I don't know what that means.  And then there's trades of

19     insults about who's a rat and who's not a rat.

20             Then the CW explained to Taylor that Capolongo gave

21     the pay-and-collect job for CIRS to Camacho, and Camacho lost

22     the money.

23             The CW also told Taylor that Camacho was paid back

24     $250,000, and that Camacho makes payments to Tognino.

25             At any rate, there's a lot of money involved here that

1   is not true of all of the other defendants that I have

2   sentenced.  If there is a dispute about that, if there's

3   objections, then let's talk about it.

4             MR. RASKIN:  My understanding of this is that

5   Mr. Capolongo kind of felt responsible, but he is the one that

6   got the confidential witness the job of paying and collecting

7   for the offshore site.

8             Then, when the confidential source lost or stole the

9   money, Mr. Capolongo was embarrassed and felt that perhaps he

10  could help.  There was nothing about him being involved in

11  violence.

12            All he said, basically told Taylor not to get involved

13  with that.  He would try to take care of it with the offshore

14  gambling site.

15            That's our understanding of what happened there.

16  Certainly he had nothing to do with offering or dealing with

17  Merlino concerning collecting that money.

18            THE COURT:  All right.

19            Then another question I had is about Mr. Lacava.

20  According to what's in the presentence report, Lacava took over

21  the courier position from CC1, paying and collecting money for

22  Capolongo in connection with the illegal sports gambling

23  business; and that the CW met with Lacava many occasions to pay

24  and collect from Capolongo.

25            So Mr. Lacava is sort of doing the work on behalf of

Haencaps

1   Mr. Capolongo, right?

2           MR. RASKIN:  It was for betting and again --

3           THE COURT:  I'm not saying it is violence.

4           MR. RASKIN:  There was betting.  He was in the

5   gambling business.  He pled guilty to it.  He is guilty of it.

6           Mr. Lacava was simply -- he was -- Mr. Capolongo was

7   in Florida, Mr. Lacava was in New York, and he collected some

8   money on behalf of Mr. Capolongo.

9           THE DEFENDANT:  That's correct, your Honor.

10          THE COURT:  I guess that's one of my questions, is the

11  relationship between Mr. Lacava and Mr. Capolongo.  It sounds

12  like Mr. Capolongo hired or recruited Mr. Lacava to do his work

13  for him up here.

14          Is that right?

15          MR. RASKIN:  To collect on bets that he made.

16          THE COURT:  Right.

17          MR. RASKIN:  Again, there were lots of wiretaps, not

18  only in this case but in the Broward case and in the Rockland

19  case.

20          While I haven't heard the Rockland tapes, I have

21  heard -- or read the transcripts or notations of the

22  conversations in both of other cases.

23          When I tell you 98 percent of the conversations with

24  Mr. Capolongo are personal betting or betting talking about

25  sporting events, talking about -- it's as a gambler, your

Haencaps

1    Honor.  Simply as a gambler.

2          Again, he did gamble on behalf of himself and on

3    behalf of others, and he did act as a pay-and-collect person

4    for the offshore site until he stopped and the CW took over for

5    him.  That's really what he did in this case and in the other

6    cases.  There's no difference.

7          THE COURT:  OK.

8          I guess one question I have, then is should there not

9    be some kind of leadership role, supervisory role for

10   Mr. Capolongo in light of the fact that he recruited

11   Mr. Lacava?  That's what it reads like in the presentence

12   report.

13          Let me ask the government, and then I will come back

14   to you, Mr. Raskin?

15          MS. KRAMER:  So, your Honor, it is a little bit of a

16   difficult question when it comes to the defendants who are

17   involved in the gambling schemes in this case as to whether

18   there should be leadership points attributed.

19          We engaged in a lot of internal discussion about this.

20   Because of the fact that inherent in these gambling operations

21   is some amount of hierarchy, so someone is placing bets for

22   someone else, someone is collecting, the very nature of the

23   offense itself involves working with others, and in some cases

24   giving direction to others.

25          THE COURT:  Well, look, yesterday I had Mr. Camisa,

Haencaps

1    and Mr. Camisa it looked like was sort of acting at the

2    direction of Mr. Casablanca.  It seems like Mr. Casablanca is a

3    supervisor or manager or leader or organize he of that

4    activity, and the guidelines calculation ought to reflect that.

5         I am not sure why the same wouldn't be said for

6    Mr. Capolongo vis-a-vis Mr. Lacava.  What is the difference?

7         No violence that I am aware of, though collecting, it

8    would seem to me is sort of it's inherent in the collecting

9    business that if you don't collect or if people don't pay up

10   that there are consequences.  But nobody is suggesting that

11   there were any threats made, so I am not going to make any

12   enhancements for that.

13        But why not?  Why is there no role enhancement here?

14        MS. KRAMER:  Well, I think reasonable minds could look

15   at the conduct in the case and come to two different

16   conclusions about whether a role enhancement should apply.

17        There are a number of defendants where there seems to

18   be some direction that they are either taking or giving to

19   others, but what we know about them is not necessarily that

20   they functioned as a leader.

21        It's really the nature of the criminal conduct that

22   working as a part of this type of gambling operation involves

23   some amount of directing others.  So, having some intellectual

24   discourse about whether leadership should apply and seeing that

25   there were two sides, we opted to take the view that was most

Haencaps

favorable to the defendants when making a close call with

respect to the gambling operation because of the nature of the

operation itself.

THE COURT:  We have CC1 and then we have Lacava, each

of whom are paying and collecting money for Mr. Capolongo,

right?

MS. KRAMER:  That's correct, your Honor.

THE COURT:  And they get paid by whom?

MS. KRAMER:  By Mr. Capolongo, your Honor.

THE COURT:  OK.

Is there anybody else who is doing a comparable thing

on behalf of Mr. Capolongo?

MS. KRAMER:  I don't believe so, your Honor.

THE COURT:  OK.

Mr. Raskin, that sounds to me like two points; not

four, not three, but two.

So why is that mistaken?  Maybe three.  I mean, it is

extensive activity, so I guess it could be three.

MR. RASKIN:  Mr. Capolongo and Mr. Lacava are longtime

friends.

This simply happened because Mr. Lacava was in New

York, the bets were made in New York, or the people with whom

the bets were made were in New York, and Mr. Capolongo was in

Florida.

He certainly wasn't an employee.  He did it simply as

Haencaps

1   a favor to his friend of many years.  So we don't think, we

2   agree with the government that --

3          THE COURT:  He just did it as a friend?  That's what

4   you are saying?  This is just sort of once-in-a-while thing

5   between friends?

6          MR. RASKIN:  Yes.

7          THE COURT:  OK.

8          Ms. Kramer, do you concur with that characterization?

9          MS. KRAMER:  No, your Honor.

10         THE COURT:  So maybe we do need a hearing then.

11         What would you understand the relationship to be based

12  on the evidence that has been collected?

13         It is not just a once-in-a-while thing between

14  friends.  It's what?  A regular thing that he works for,

15  answers to, and is paid by Mr. Capolongo?

16         MS. KRAMER:  I don't know if I would say it is a

17  regular thing, your Honor.  But I don't think it was based on

18  just doing a favor as a friend.

19         I think with respect to this type of gambling

20  operation there is a question of whether, you know in a

21  conspiracy there may be individuals who at times give

22  direction, at times receive direction, and they don't all get

23  leadership enhancements based on the role that they played at

24  those different times.

25         I think in the criminal gambling business that we are

Haencaps

talking about, there are different roles that people play, and

it doesn't necessarily give rise to a leadership enhancement.

I don't think this was a favor that was being done as a friend,

but I do think there is a reasonable basis to not assign

leadership points here.

THE COURT:  Then tell me about the relationship or the

roles played by Mr. Capolongo and Mr. Tognino?

How do they compare?

MS. KRAMER:  I think this defendant, your Honor, is

more serious, more culpable, and has been involved for four

decades in this crime.  So I think, putting them side by side,

this defendant is more culpable.

THE COURT:  OK.

Do you want to respond to that, Mr. Raskin?

MR. RASKIN:  I am not in a position to respond, your

Honor.

THE COURT:  I will give you an opportunity, but you

don't have to.  Thank you.

Ms. Kramer, anything else you would like to say with

respect to sentencing?

MS. KRAMER:  No, your Honor.

Thank you.

THE COURT:  Anything else you would like to say,

Mr. Raskin?

MR. RASKIN:  No, sir.

Haencaps

1          THE COURT:  Mr. Capolongo, anything you would like to

2     say?

3          You are not required to, but you're welcome to.

4          THE DEFENDANT:  I am just very sorry for all this

5     trouble.

6          THE COURT:  OK.

7          THE DEFENDANT:  Did you hear that.

8          THE COURT:  I did.

9          That is fine.  Thank you.

10          What I would like to do is take a short break to

11     collect my thoughts, think about what we have been discussing

12     today, and I will come back in about ten minutes.

13          At that point I will tell you the sentence I intend to

14     impose, I will explain my reasons, and I will check with the

15     lawyers to make sure I am not doing something illegal.

16     Assuming I haven't, I will then formally impose the sentence at

17     that point.

18          Sorry to drag this out, but I get up in the morning

19     with a view as to what I'm probably going to do, but I want to

20     remain open minded, so I can listen to the lawyers and listen

21     to the defendant and make sure that I am giving them a full

22     hearing and I'm open to being persuaded and moved by some of

23     the arguments that are being made here.  Otherwise what would

24     be the point.

25          Let me think about what I have heard and we will be

Haencaps

1   back shortly.

2              Thank you.

3              About ten minutes.

4              (Recess)

5              THE COURT:  Have a seat.  Thank you.

6              All right.  Thanks for your patience.

7              I only get to do this once so it's important that I

8   have an opportunity to really think it through and to consider

9   all the arguments that have been made and all the facts that

10  have been presented.

11             There are a lot of facts here that require a lot of

12  consideration.

13             On the one hand, I have letters from folks who know

14  you best, and they seem to say that you are a decent guy, and

15  obviously you have made a difference in their lives, and I

16  credit that.  I have no reason to doubt it.

17             It sounds like you play a meaningful role in the lives

18  of your grandkids and that whatever sentence I impose here is

19  going to have an impact on them, and I don't think that

20  lightly.  I think that is a real thing and your relationship

21  with them is to your credit and to their benefit, and so I

22  believe it.  I give credit to that.

23             On the other hand, I mean, I just look at the sheer

24  number of convictions here, which sort of just takes this into

25  a totally different place than most of the defendants that I

Haencaps

1    have encountered so far and the length of the sentences.

2             I mean, there is a series of convictions for gambling

3    records and promoting gambling that result in 30 days and 45

4    days and 90 days and fines and then you get 16 months to four

5    years in 1991, 16 months to four years in 1995, 18 months to

6    three years in 1999 --

7             THE DEFENDANT:  Excuse me, your Honor.

8             THE COURT:  Yes.

9             THE DEFENDANT:  They're wrong.

10            THE COURT:  They're wrong?

11            Then we better clean this up.

12            THE DEFENDANT:  I only went to jail twice in my life,

13   the Nassau County case and the federal case for 46 months.  I

14   never did these other times at all.

15            THE COURT:  They may have been concurrent.  I don't

16   know.

17            THE DEFENDANT:  No.

18            THE COURT:  Then I think we have to put this off.  If

19   there are objections to what's in the report, then those

20   objections should have been made.

21            THE DEFENDANT:  I've only been in prison twice.  I

22   just want you to make note of it.  The Nassau County case --

23            THE COURT:  The Nassau County case was 16 months to

24   four years.

25            THE DEFENDANT:  I had one and a half to three there,

Haencaps

1  and the 46 months that I did.  That's it.

2        THE COURT:  Let me finish.

3        So you got sentenced in October of 1991 in Nassau

4  County, and it says you got paroled in 1995, in May of 1995.

5        THE DEFENDANT:  I did a year.  I don't know what that

6  comes to.

7        THE COURT:  That looks like more than a year.

8        THE DEFENDANT:  I did a year, your Honor.  That is it.

9  Period.

10        THE COURT:  Then there is a Westchester case where the

11  sentence imposed was 16 months to four years.  It doesn't say

12  when you got out.

13        All it says here is that you were convicted after a

14  jury trial.

15        THE DEFENDANT:  Is that the federal case?

16        THE COURT:  No.

17        THE DEFENDANT:  I never -- hang on.

18        I know what happened.  I was doing federal time, the

19  46 months' case, and they ran it concurrent with the

20  Westchester County case.  That was it.

21        THE COURT:  The Westchester County case, the sentence

22  was imposed in 1995.

23        THE DEFENDANT:  I didn't do no time in Westchester.

24        THE COURT:  The federal case was not imposed until

25  1999, so I don't know that would be concurrent.

Haencaps

1          You did have a 1999 Bronx County conviction, and then

2     a 1999 federal conviction in the Eastern District.

3          THE DEFENDANT:  Right.  That is correct.  I didn't do

4     the Westchester County time, and I didn't do all these other

5     times.

6          The only other time was Nassau County, one and a half

7     to three.  I did a year.

8          THE COURT:  All right.  I would like truthful

9     information.  I would like accurate information.  If there's

10    mistakes in the presentence report, that should be brought to

11    my attention.

12         THE DEFENDANT:  I didn't do 30 days, 45 days, 60 days,

13    none of them.

14         THE COURT:  They may have been suspended sentences,

15    but --

16         THE DEFENDANT:  I'm getting old, but I am not that --

17    that I forget that much.

18         THE COURT:  OK.

19         So then we will put this off.  How long do you need to

20    correct the criminal history?

21         You should sit down with Mr. Capolongo and figure out

22    what it is that he really did serve.  Where that is

23    inconsistent with what's in the presentence report, I guess I

24    want to know it.

25         MR. RASKIN:  What we are disputing I guess is the

Haencaps

1  number of times he actually went to jail, not convictions.

2  Those convictions are accurate.  We just believe -- again, he's

3  been to jail twice.

4         THE COURT:  What it says is what it says.  He got

5  sentenced to ten days in 1980.  It says fine paid.

6         Maybe it was a fine in lieu of the ten days.

7         45 days' imprisonment in 1983, fine paid.  Maybe that

8  was in lieu of the time.

9         1984, 60 days' imprisonment, fine paid.

10         Then there's 1984, 30 days' imprisonment, fine paid.

11         Maybe those were all fines.  I don't know.

12         THE DEFENDANT:  Yeah.

13         THE COURT:  Then we have 1985, 90 days' imprisonment,

14  fine paid.

15         We have then promoting gambling in the first degree,

16  Nassau County, sixteen months to four years.

17         THE DEFENDANT:  That's correct.

18         THE COURT:  It says paroled May 2, 1995.

19         MR. RASKIN:  Does that sound right?

20         THE DEFENDANT:  I did a year there, your Honor.

21         THE COURT:  That is not what it says here.

22         Then we have --

23         THE DEFENDANT:  How can we get those records?

24         THE COURT:  It says 1995, sixteen months to four years

25  imprisonment, $180,000 fine, convicted after a jury trial on

37

Haencaps

1    April 22, 1992.  So I don't know what the real story is there.

2           Then I've got 18 months to three years in the Bronx,

3    1999.

4           It doesn't say when you got released there.  It says

5    you plead guilty April 20, 1999.

6           It sound like what happened is sort of like you're

7    doing now, you waited until the federal case is done, then you

8    get yourself sentenced in the state to avoid the extra criminal

9    history points, and then you can get concurrent time and you

10   are no worse for it on a federal sentence.

11          It is a game that people play.  It is not an unwise

12   game, but it is a game.  Ultimately there is no hiding behind

13   the fact that these are all real convictions

14          THE DEFENDANT:  They are all convictions, your Honor.

15   I am not denying that.  Believe me.  I didn't do this time.

16          MR. RASKIN:  He's just saying he's been to jail twice.

17          THE COURT:  I would like to know exactly what the

18   length of sentence was that was actually served.  If there are

19   errors in what was imposed, I want to know that too.

20          MR. RASKIN:  If that is something that will affect

21   your sentence, your Honor, then we will need some additional

22   time to try to straighten it out.

23          THE COURT:  That is fine.

24          I guess, while we are at it, I would like to know more

25   about the Florida case.  That sentencing is pending?

Haencaps

1           MR. RASKIN:  Yes.

2           THE COURT:  Ms. Kramer, is that the same conduct as

3    here, or is that different conduct.

4           MS. KRAMER:  It's forms a part of the conduct here.

5           THE COURT:  All right.

6           MS. KRAMER:  So it's connected to the conduct here in

7    one of the schemes.

8           THE COURT:  Well, I mean, for the Rockland County

9    case, what probation says is that this conviction arises out of

10   relevant conduct that was a part of the instant offense.  So

11   that won't count and doesn't count for criminal history

12   purposes.

13          Is the same true with respect to the Florida Broward

14   County case?

15          MS. KRAMER:  I believe so, but I would like to confirm

16   that for your Honor.

17          THE COURT:  I would like that to be confirmed.

18          MR. RASKIN:  We believe so as well.

19          THE COURT:  So I guess I would like to get submissions

20   on criminal history and the open case in Broward County.

21          How long do you think you need, Mr. Raskin?

22          THE DEFENDANT:  We might need two months.  I don't

23   know how easy it is to get these records.

24          MR. RASKIN:  Exactly.

25          THE COURT:  I don't know.

1          MR. RASKIN:  Can you give us three weeks and let us

2   try?

3          THE COURT:  I will give you more than that if you

4   want.

5          THE DEFENDANT:  We might need more than that.

6          MR. RASKIN:  We may need more than that, your Honor.

7   These are old convictions.

8          THE COURT:  All right.

9          Why don't you send me a letter in three weeks, tell me

10  how much time you think you need and when you think you would

11  be available for sentencing.

12         MR. RASKIN:  Yes.

13         THE COURT:  Depending on the answers, then I will

14  reschedule sentencing.  At this point I'm likely to go above

15  guidelines.  I'll tell you candidly.  The sheer number of

16  convictions.  The sheer repetitiveness of this conduct, the

17  absolute lack of respect for law and the fact that even a

18  federal sentence of 46 months didn't seem to have much of an

19  impact, all lead me conclude that this is a situation where an

20  upward departure is warranted from what the guidelines are.

21         So I just want everybody to be on notice about that.

22         OK.  So you can address that in your submission if you

23  would like too.  Now you have a better insight as to sort of

24  where my head is at.

25         MR. RASKIN:  Yes.  Thank you.

Haencaps

1          THE COURT:  OK.  Three weeks I will hear from you and

2     then, depending on what you say, I'll either set a new date for

3     further submissions.

4          MR. RASKIN:  Yes.

5          THE COURT:  Or I'll set a new sentencing date, and you

6     will then come in.

7          MR. RASKIN:  Thank you.

8          MS. KRAMER:  Thank you, your Honor.

9          THE COURT:  Ms. Kramer.

10          MS. KRAMER:  I will be diligently working to sort out

11     the --

12          THE COURT:  Why don't you submit something in three

13     weeks also.  Then once I have both of your submissions, I will

14     then decide what's next.

15          OK?

16          MS. KRAMER:  Thank you, your Honor.

17          MR. RASKIN:  Thank you.

18          THE COURT:  Mr. Capolongo, I am going to keep you out

19     on bail in the interim.  So continue to abide by the conditions

20     of bail and then be in touch obviously with Mr. Raskin so that

21     you know what is going on.

22          OK?

23          MR. RASKIN:  Yes, your Honor.

24          THE COURT:  All right.  Let's leave it at that.

25          Let me thank the court reporter.  I will issue a short

Haencaps

1   order just about the scheduling.  We are not done yet.

2            THE DEFENDANT:  I'm sorry.

3            THE COURT:  Until I leave, you don't leave.

4            I think that is part of the problem here.  There is a

5   sense that this is sort of like going to the DMV for you.  You

6   have been in so many courtrooms with so many judges on so many

7   criminal cases that this is just sort of like a bank

8   transaction, and that's why I'm sort of inclined to think that

9   an above-guidelines sentence is absolutely appropriate.

10           So there is a mindset here that seems to think that

11  this is just par for the course.  This is a way of doing

12  business, that you are going to continue engaging in illegal

13  gambling activity because that is what you do, and the rest of

14  us just have to adjust.

15           MR. RASKIN:  Judge, I have --

16           THE COURT:  That ain't going to work.

17           MR. RASKIN:  I have spent a great deal of time with

18  Mr. Capolongo over the last couple of years, and he has been

19  taking this seriously.

20           THE COURT:  I don't know.  I don't get it.

21           I don't think that the history in front of me reflects

22  that.  He seems like a nice guy.  I'm sure we would enjoy each

23  other's company if we were watching a ballgame in a bar.  But

24  we are not in a bar.  We are in a courtroom, where I have a

25  criminal history that is, frankly, insulting.

Haencaps

1           So to come in and say, Oh, he gets it now, this is a

2    come-to-Jesus moment is I just think preposterous.  Eventually

3    he's going to age out of this criminal conduct, but I don't

4    think that will have anything doing with the criminal

5    sentences.  It will just be biology and mortality.

6           Anyway, we'll see.  You can address some of these

7    points, but I think this is a different case than the others

8    that I have seen.

9           OK.  So thanks.

10          (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25